**AMERICAN. ANODE, Inc., v. LEE–TEX RUBBER PRODUCTS CORPORATION.**

No. 1240.

District Court, N. D. Illinois, E. D.

July 1, 1942.

Harrison F. Lyman, of Boston, Mass., and John Vaughan Groner, of Fish, Richardson & Neave, of New York City, and George A. Chritton, of Chritton, Wiles, Davies & Hirschl, of Chicago, Ill., for plaintiff.

Ralph Barrow, of Akron, Ohio, William Gates, Jr., of Roberts, Cushman & Woodberry, of Boston, Mass., Joseph G. Slottow, of Slottow & Leviton, of Chicago, Ill., for defendant.

CAMPBELL, District Judge.

Plaintiff, American Anode, Inc., brings this suit against defendant, Lee-Tex Rubber Products.Corporation, for infringement of two patents, the property of the plaintiff. The patents involved are Klein and Szegvari, No. 1,825,736, wherein plaintiff relies on claims 1, 16, 18, and 19, and Twiss, No. 1,996,051, wherein plaintiff relies on claims 2, 4, 17, 18, 28 and 29. Both patents relate to a process for manufacturing rubber goods directly from latex by the immersion into the latex of forms previously treated with a coagulating substance. The coagulating substance when coming in contact with the latex releases positive ions which neutralize the negative charges on

latex particles close to the form, causing them to be deposited on the surface of the form. Thus is produced a rubber article the size and shape of the form immersed, which is then finished by drying, leaching, vulcanizing, etc.

The validity of the two patents in suit is challenged by the defendant who very ably presented the entire history of this art during the trial. The defendant contends that these patents are "mere paper patents" and that they have contributed nothing to the art. It is true that the production of various rubber articles by dipping in latex is not original with these inventors. It seems well established as a native practice in parts of South America for several centuries past. Defendant's prior art references indicate the practical fashioning of usable rubber articles in this manner by the natives of Peru as early as 1736. The various treatises and authorities cited by the defendant show constant experimentation and development in this field down through the years in South America, in Europe and in the United States. Of particular importance is the enlightening and productive research of Morisse and of Hancock as well as of various others.

I am convinced, however, after an exhaustive review of all of the material submitted by the defendant relative to the prior art, including a careful study of the prior art patents set up in the answer and helpfully illustrated by the various plates introduced into evidence by the defendant, that the vast improvement represented in the present commercially successful use of this process stems from the Klein and Szegvari patent in suit, and, although the process itself is old and well known, that the material improvements and commercial adaptability developed by Klein and Szegvari constitute patentable invention. I am further of the opinion that the improvements over Klein and Szegvari as developed by Twiss are of sufficient further importance to also constitute patentable invention, and in this I agree fully with the opinion of the Court of Customs and Patent Appeals in passing on the Twiss patent in suit in a decision reported in Re Twiss, 74 F.2d 124.

The defendant's further contention that the claims in suit are invalid because of art intervening between their effective date and the date they were asserted is without merit in my opinion.

It is therefore my opinion that Claims 1, 16, 18, and 19 of Klein and Szegvari Patent No. 1,825,736 and Claims 2, 4, 17, 18, 28, and 29 of Twiss Patent No. 1,996,051 here in suit are valid. I am strengthened in this opinion by the great commercial success which the evidence shows to have been enjoyed by the plaintiff and its various licensees following the plaintiff's introduction to the trade of the process described in its patents. The plaintiff's claimed establishment of a new industry as a result of this process seems well founded in the evidence.

Being satisfied of the validity of the claims here in suit, I shall now consider the matter of infringement. Two operations of the defendant are alleged to infringe. The one is its regular or commercial process; the other its developer or "M 160" process.

The regular or commercial process of the defendant is described in the stipulation filed herein as follows:

"(1) Aluminum forms are first dipped in a solution of Calcium Nitrate in Synasol (Synasol being a trade-name for a product made by mixing 100 gallons of 200 proof ethyl alcohol with 5 gallons 100 proof wood alcohol, 5 gallons ethyl acetate and 1 gallon aviation gasoline) bought from W. H. Barber & Co., Chicago, to a point about one and one-half inches from the top end of the form. The proportion of Calcium Nitrate to Synasol is 11 ounces to the gallon, and the Calcium Nitrate is of the hydrous type (the only type obtainable commercially). This Calcium Nitrate contains about 13% moisture.

"(2) The form is then withdrawn from the first dipping bath and dipped again in a dispersion of Snow Floss (Snow Floss being a trade-name for a dry, finely divided dusting agent comprising about 92% diatomaceous silica) in Synasol to which Calcium Nitrate of the type referred to in paragraph 1 hereof has been added in the proportion 2 ounces to each gallon of Synasol, up to a point of about two inches from the top of the form. The Snow Floss is bought from Johns-Manville Sales Corp. The proportion of Snow Floss to Synasol is 8 ounces to the gallon.

"(3) Then after some little interval, the form is put into a drying oven maintained at a temperature of substantially 170° F. and kept there from two to five minutes until the form is dry to the touch.

"(4). At periods ranging from five to ten minutes thereafter the form is dipped into Vultex (Vultex is a latex composition, whether vulcanized or unvulcanized), which is maintained at a temperature of from 65° to 68° F., and kept there from two to thirty seconds, depending on the thickness desired in the finished article.

"(5) While still on the form the rubber article is put into a leaching tank containing water at a temperature of substantially 190° F., where it is kept from five to ten minutes, depending on the thickness of the rubber article.

"(6) From the leaching tank the form goes into a drying oven maintained at a temperature of substantially 170° F. for from forty to sixty minutes, depending on the thickness of the rubber article.

"(7) Thereafter the rubber articles are stripped from the forms.

"(8) The forms are then washed in water heated to 90° F. in contact with revolving brushes."

Defendant contends that this process does not infringe Klein and Szegvari because the process of that patent is limited to the disclosed use of a porous cup form in which the coagulating substance is enclosed; whereas in defendant's process an impervious form (aluminum) is used and the coagulant placed on the outside thereof by dipping. Although it is true that Klein and Szegvari does disclose in most of its claims the use of the porous cup, nevertheless, the fundamental teaching of Klein and Szegvari is that an increased thickness of rubber deposit can be obtained upon dipping a form in latex if the form has previously been associated with a coagulating substance. This teaching is clearly followed by the defendant's process. Likewise three of the four claims of the Klein and Szegvari patent relied upon in this suit do not contain reference to the use of the porous cup but are expressions of the basic teaching of the patent and certainly apply to the defendant's process. I refer to claims 1, 16 and 18. It is my opinion that the defendant's regular or commercial process infringes claims 1, 16 and 18 of the Klein and Szegvari patent in suit.

Defendant further contends that this regular or commercial process does not infringe the Twiss patent in suit since the defendant's process uses, instead of a gel layer process, the application of an alcohol solution and the drying of the coagulant before immersion into the latex, and that no such alternative procedure is disclosed by Twiss. Twiss, it will be recalled, refers entirely to the use of impervious forms on the exterior of which the coagulant is applied, and is for that reason regarded as patentable over Klein and Szegvari. A careful reading of the claims of the Twiss patent here in suit reveals that they teach the process used by the defendant. In particular, claims 17, 18, 28 and 29 refer to a solidification and increased consistency in the film of coagulant prior to its immersion into the latex. Furthermore the evidence clearly establishes that the calcium nitrate used by the defendant in this process is one of the salts referred to by Twiss as a desirable coagulant. It is, therefore, my opinion that the defendant's contentions are without merit and that its regular or commercial process infringes claims 2, 4, 17, 18, 28 and 29 of the Twiss patent in suit.

The other process of the defendant alleged to infringe the patents here in suit is its developer or "M 160" process. This process is described in the stipulation filed herein as follows:

"The Vultex Chemical Co. supplies the materials for the process, which is then carried out by the Lee-Tex Rubber Products Corporation in the depositing of rubber articles on the aluminum forms. The Lee-Tex Rubber Products Corporation secures from Vultex Chemical Co., a compound, which it is informed is made according to a secret formula, and is sold under the identifying mark 'M 160'. 26.5 pounds of Snow Floss is added to 55 gallons of the 'M 160' solution. * * *

"The aluminum forms are dipped once in the bath just described, which is called the developer bath. The forms are coated with developer up to a point about one and one-half inches from the top of the form.

"Thereafter the forms coated with developer are dried and heated, as set forth in paragraph (3) above, for three minutes until the form is dry to the touch, and then dipped for fifteen to thirty seconds in a tank which contains a special kind of Vultex called 'Modified Vultex' ('Modified Vultex' is a latex composition, whether vulcanized or unvulcanized), which is susceptible to the action of the developer and deposits rubber on the form. The composition of the 'M 160' and the 'Modified Vultex' are trade secrets and unknown to them or any officer, employee or servant.

of the Lee-Tex Rubber Products Corporation.

"Thereafter the rubber articles so made are treated substantially in the same way and in the same sequence of steps as have been heretofore described for the first process. * * *

" 'M 160' has the following composition:

| Zinc-Ammonia reaction product | 145 lbs. | 5 oz. |
|---|---|---|
| Monoethanolamine | 59 " | 8 " |
| Water | 227 " | |
| Aqua ammonia 26° Be | 18 " | 12 " |
| Igepal C | 5 " | 4 " |
| Sodium chromate | 1 " | 8 " |

"This formula produces about 55 gallons. The Igepal C referred to in the formula is a wetting agent bought from the General Dyestuff Corporation, * * * and is used in said formula solely as a wetting agent.

"The Monoethanolamine used is secured from the Carbide & Carbon Chemical Corporation.

"The zinc-ammonia reaction product is made as follows:

"90 lbs. of zinc chloride are slowly added to 270 lbs. of 26° Be aqua ammonia under slow agitation. The mixture is then cooled, the weight of the system balanced by the addition of enough 26° Be aqua ammonia to replace any evaporation losses, and then allowed to stand from one to two days, after which it is filtered.

"The zinc chloride used is secured from the Grasselli Chemical Company and is understood to be anhydrous."

The defendant contends that this developer or "M 160" process does not infringe either of the patents in suit, because the agglomeration of rubber particles on the aluminum form used in this process is caused by the dried deposit of M 160. That such dried deposit is not a coagulant but is a mixture of neutral zinc compounds which are not salts at all and which contain no ions, either monovalent or polyvalent. That such dried deposit subsequently assists a process of dehydration from which a coagulum develops.

Several tests were conducted before the Court by the defendant to sustain its conclusions in this regard and by the plaintiff to refute them. Experts for both sides also testified accordingly.

Although it seems clear that a coagulum formed by dehydration as the defendant describes, and a coagulum formed by ionic coagulation may be different, nevertheless it is my opinion that the patents in suit include both types of coagulation. Thus, although I do not agree with the defendant's conclusion that the deposit of rubber produced on the form in its developer or "M 160" process is produced by dehydration rather than by ionic action, nevertheless it seems immaterial since the patents in suit cover both types. I would, however, like to observe in passing that in my opinion the evidence sustains the plaintiff's conclusion that the deposit of rubber produced on the form in the defendant's developer or "M 160" process is the result of ionic coagulation, produced by the zinc salts which are present in the dried deposit of the M 160, and which, when the form is immersed in the latex, release positive ions (whether monovalent or polyvalent), thus neutralizing the negative charges of the rubber particles dispersed in the latex and causing the particles to adhere to the form.

It is, therefore, my opinion that the defendant's developer or "M 160" process follows the teaching of the patents in suit and merely uses a different coagulant than that commercially used by the plaintiff. Accordingly, in my opinion the defendant's developer or "M 160" process infringes claims 1, 16, 18 and 19 of the Klein and Szegvari patent; and claims 2, 17, 18, 28 and 29 of the Twiss patent. I do not hold claim 4 of the Twiss patent infringed since this claim is limited by its disclosure to the liberation of polyvalent metalic ions and the plaintiff has not proved, by a preponderance of the evidence, that the positive ions released by the zinc salts in the dried M 160 are polyvalent rather than monovalent.

The Court accordingly finds the issues for the plaintiff and a decree in conformity herewith will enter.