## AMERICAN ANODE, Inc., v. LEE–TEX RUBBER PRODUCTS CORPORATION.

### No. 8194.

Circuit Court of Appeals, Seventh Circuit.

May 28, 1943.

Rehearing Denied Aug. 4, 1943.

J. Ralph Barrow, of Akron, Ohio, Wm. Gates, Jr., of Boston, Mass., and Geo. I. Haight, of Chicago, Ill., for appellant.

Edgar H. Kent and Harrison F. Lyman, both of Boston, Mass., John V. Groner, of New York City, and Geo. A. Chritton, of Chicago, Ill., for appellee.

Before SPARKS, MAJOR, and MINTON, Circuit Judges.

SPARKS, Circuit Judge.

Plaintiff charged defendant with the infringement of United States patent No. 1,825,736 to Klein and Szegvari, and United States patent No. 1,996,051 to Twiss. The first patent was issued October 6, 1931, on an application filed May 29, 1926. The second patent was issued April 2, 1935, on an application filed February 19, 1931. Both patents are owned by the plaintiff. Claims 1, 16, 18 and 19 of the first patent, and claims 2, 4, 17, 18, 28 and 29 of the second patent were relied upon. The defenses were invalidity and non-infringement. The court found that all the claims relied upon in both patents were valid, and that all such claims, except claim 19 of the first patent, were infringed by the defendant's device, referred to as its "regular process"; and that all claims relied upon, except claim 4 of the second patent, were infringed by defendant's device referred to as its "developer process." The District Court made special findings of fact and rendered its conclusions of law thereon. A decree was accordingly entered in favor of the plaintiff, and from that decree this appeal is prosecuted.

The District Court filed its written opinion, 45 F.Supp. 750, in which it fully set forth the disclosures of the patents, the

nature of the accused devices, and the prior art upon which defendant relies.

It is sufficient to say that both patents relate to a process for manufacturing rubber goods directly from latex by immersing in the latex, forms previously treated with a latex coagulant. Latex is obtained from the rubber tree. It is a white milky liquid which exudes from the tree and contains miscroscopic particles of suspended rubber moving about in a liquid which is essentially water. Each of the tiny particles of rubber naturally carries a negative electric charge, referred to as a negative ion. In its natural state each negative ion repels its neighbor and they never agglomerate until the water is eliminated from the latex or until the negative electric charge is neutralized so that the particles of rubber no longer repel each other but gather in groups and form clots like curds in sour milk. Such action is known as ionic coagulation and may be produced by adding any of some hundreds of substances, known as rubber coagulants, among which are acids and salts of bivalent metals.

It is conceded that the obtaining of rubber from latex by dehydration and by ionic coagulation is very old in the art. For generations it was known that rubber articles of the character here under discussion could be made by dipping in latex, molds or forms of such articles, withdrawing the forms, and then allowing the latex adhering to the forms to dry. One such immersion was known to produce a rubber film but it was too thin to be commercially valuable, and repeated operations of the same character were essential to produce a thickness of rubber which was commercially valuable. This was a very slow process and the disclosures of recent years have been along the line of expediting the production. For instance, Klein and Szegvari, hereafter referred to as Klein, disclosed that the thickness of a rubber deposit obtainable on a mold dipped in latex might be greatly increased by first dipping the mold in a coagulant for latex so that positive ions released by the coagulant would neutralize the negative electric charges in the rubber particles of the latex and cause them to coagulate in a film on the surface of the form. Klein specifically suggested the use of a hollow porous mold or form, within which mold was provided a store of liquid coagulant which migrated outwardly into the latex through the pores of the form.

The Twiss patent was an improvement on Klein. It disclosed that the result of increased thickness of deposit could be better obtained by using an impervious mold, instead of a porous one, and applying the liquid coagulant to the surface of the mold, which coagulant is reduced to a solid or semi-solid condition, by drying for a brief period before dipping into the latex. The processes of both patents are referred to as the "coagulant-dip" process, by means of which the rubber articles referred to are fabricated with but a single dip. The thickness of the article produced depends upon the length of time the form is left in the latex. Regardless of patentability, the disclosures of these patents have resulted in a great saving of time, labor, floor space, equipment and cost to the plaintiff and its licensees. Furthermore, the goods produced by these processes cover a wider range of articles of superior strength, uniformity and length of life than were produced by the former processes, which facts have resulted in a noteworthy commercial success which cannot be denied.

Defendant's processes which are here charged to infringe are referred to as its "regular" or "commercial" process, and its "M160," or "developer" process.

The District Court found that the defendant's "commercial" process is identical with plaintiff's commercial practice of the coagulant-dip method. In it an aluminum form is dipped in a liquid solution of calcium nitrate (a coagulant for latex), removed, and the coagulant dried, whereupon the coagulant-coated form is dipped in latex. It is kept in the latex for a period of time, depending upon the thickness desired in the finished article, whereupon the form, upon which a layer of coagulated rubber has been deposited, is removed; and the rubber article, after washing and drying, is stripped from the form.

In the "M160" or "developer" process the procedure is similar to that in the "commercial" process, except that a material known as M160 is used as a dip for the form instead of calcium nitrate. The content of M160 was specifically described in the stipulation, and the District Court found that it is a substance capable of coagulating and agglomerating rubber particles of latex, which when associated with the form, acts to increase, as desired, the thickness of the coherent rubber layer ob-

tained on the form, and substantially to the same extent as such thickness is increased by the use of calcium nitrate in defendant's regular process, and this is the function and the purpose for which defendant used M160 in this process. The defendant argues that its accused process does not infringe the Klein patent because that patent should be limited to the use of a porous mold. It further contends that its M160 process does not infringe either of the patents because that process does not produce a layer of rubber by ionic coagulation while the form is in the latex, but rather by dehydration.

The defendant argues that the claims relied upon in the Klein patent were anticipated (1) by the practice of the early Brazilian natives in forming blocks of crude rubber for commercial purposes as described in Seeligmann's book; (2) by the description of an experimental variation of that practice in Morisse's book, and (3) by Swett patent No. 1,348,459, all of which are specifically referred to in the District Court's opinion. We think the ancient practice described by Seeligmann cannot be said to anticipate the Klein disclosures. It seems quite clear that these early natives had no knowledge of ionic coagulation, or that smoke of any kind contained traces of acetic acid, or that such acid was a coagulant of latex. According to Seeligmann, these early natives exposed the paddle to the smoke merely for the purpose of preventing the rubber from adhering to the paddle. They had no thought that the smoke contained a coagulant of latex or that it was necessary to have such a coagulant. Neither does their practice, nor the publication of Seeligmann with respect to that practice, disclose anything which can be considered as anticipatory of the defendant's coagulant-dip process.

The Morisse publication proposed an improvement over the early Indian practice of obtaining crude rubber blocks, or slabs, from latex. He proposed to substitute for the native practice of alternate dippings and dryings over a smoky fire, the addition of coagulants, such as acids, to a body of latex. This he disclosed would have the effect of coagulating the crude rubber contained in the latex, and thus form directly and with less labor, blocks of crude rubber which could be shipped as the crude rubber of commerce. All he did was to use an acid coagulant instead of the natives' heat and smoke to coagulate already deposited layers of latex, whereas in the plaintiff's coagulant-dip process the coagulant is associated with the form before it is dipped into the latex, and left therein until the proper thickness has been acquired.

In showing that soot or carbon was not necessary in order to produce the rubber which the Indians had formerly produced, Morisse said:

"* * * However, in order to try to come as close to the Indian method as possible, I mixed latex with a certain quantity of soot, a rather small amount; I then treated it (a mixture of latex and soot) with a mixed solution of acids.

"At the end of several months, due to the extreme fineness of carbon, these slabs were exactly similar to smoked rubber. I even prepared one, with the acids, on the paddle, dipping the paddle in the solution, then in the latex, and forming a *series* of layers like leaves. The ordinary cut, once the *layers* have been formed permits the rubber to be separated from the paddle; they were so completely similar to the rubber of the Indians that the latter have never wanted to believe that the rubber was obtained without their method of smoking." (Our italics.)

From this language the defendant urges that Morisse placed his acid (a coagulant) upon the paddle before dipping it in the latex. It is nowhere shown in Morisse's book that he left the paddle, which had been treated with soot and acid, in the latex for any appreciable length of time, or that he did not dip the paddle into the latex many times for the purpose of thickening the rubber slabs produced. Indeed, we think the language just quoted clearly indicates that he did not do this. It will be noticed that he uses the words "a series of layers like leaves * * * so completely similar to the rubber of the Indians that the latter have never wanted to believe that the rubber was obtained without their method of smoking." It is quite apparent that one sustained dipping would never produce laminations of the rubber, but many dippings of Morisse's prepared paddle would be the only thing which would make his product completely similar to that of the Indians. Hence, we conclude that Morisse did not contemplate the plaintiff's coagulant-dip process, nor did he anticipate it.

The defendant's expert witness expatiated upon Morisse's disclosure and

said that it was an easily workable process, and it is suggested to us that it would not be invention to travel from Morisse's disclosures to those of the patent in suit. It must be remembered, however, that the expert at the time of his testimony not only had before him Morisse's publication, but he had disclosures of the patents. However simple the transition may be from one to the other, the fact remains that Morisse never said anything about it, and the expert so far as this record discloses, had never suggested such a disclosure until he had observed the patents in suit.

Appellant further contends that Klein was anticipated by the Swett patent No. 1,348,459. The latter discloses a process in which a material known as alginate, in solution form, is subjected to chemical reaction with a soluble salt contained in a porous mold. The result is a formation by chemical double decomposition of two new substances, one of which, calcium alginate, is an insoluble material and is upon formation precipitated out of the solution on the mold. The coagulant-dip process of the patents in suit is not one of chemical reaction and no new product is formed. The process in the patents before us is a purely physical one, that of coagulation. It depends upon electrical phenomena resulting merely in a change of physical association of crude rubber particles already in existence.

From the record before us we think the District Court was well warranted in concluding that a process involving merely the physical phenomenon of coagulation is patentably distinguishable from a process involving a chemical change which forms a new product which is used as a precipitation to accomplish, in a measure, the same result as that of the coagulation. It is quite true that Swett saturated his mold with calcium chloride, which Klein also used. Each used it for a different purpose. In Swett the calcium chloride produced a new product by entering into combination with the alginate. Klein used it to provide calcium ions, without forming any new product, to neutralize the negative particles of rubber in the latex. We cannot say that Swett's disclosures furnished a guide to Klein who was seeking a process of forming dipped goods from rubber latex by a physical coagulation. Defendant's expert evidently was of the same opinion, for when asked

to mention the prior patents which disclosed Klein's process he did not mention the Swett patent, although he said he had familiarized himself with it. We agree with the District Court that the Klein patent was not anticipated by the cited prior art.

Neither does the art cited against Klein anticipate the Twiss patent which differs from Klein's preferred embodiment in that Twiss used an impervious form instead of a porous one. However, appellant urges that the Twiss patent is anticipated by the Belgian patent to Mittelland, No. 335,812. That patent discloses the coating of flexible objects, such as dolls, display figures and the like, with a layer of caoutchouc. The process is carried out by dipping the objects either in a solution of caoutchouc or in latex. Mittelland in his specification said "Further one can make these layers in a specially advantageous way by dipping the objects, *without any previous treatment,* into latex, crude or concentrated. In the latter case, one obtains a layer particularly favorable and well adherent, if one treats the *formed objects* with solutions of salt, causing precipitation of caoutchouc. The *layers* can *then* be tinted and *vulcanized* in the known manner." (Our italics.) We find nothing in this patent which warrants the conclusion that Mittelland taught that the *form* should be dipped into the salt solution before dipping it into the caoutchouc or the latex. We think the language quoted clearly imports a contrary meaning. Upon this Belgian patent, American and British patents were issued to Hergershausen. As an aid in interpreting the concept of the Belgian patent, it will be noted that in both the American and the British issues of that patent, the following language is used: "The moulded figures may, without preliminary treatment, be dipped into crude or concentrated rubber latex. In the latter case an especially favorable and firmly adhering coating is obtained if salt solutions for coagulating the rubber are applied to the latex coating." In view of these facts, we think it cannot be said that the Belgian patent anticipated the coagulant-dip process disclosed by Twiss.

The appellant further argues that the Twiss patent was anticipated by United States Patent No. 1,719,633 to Teague. This patent was cited in the Patent Office against Twiss, and was held not to antici-

pate. The Board of Patent Appeals said that the steps taken by Teague and his process were just the reverse of those utilized by Twiss. We are convinced that that conclusion cannot be denied.

Appellant further cites as prior art Hauser's book on "Latex." It is not necessary to discuss this citation because this book was not published until after the dates of invention of both patents here in issue.

It is further contended by appellant that the Klein patent should now be construed to disclose no form other than a porous one. This contention is based on the fact that the claims of this patent now in suit were not included in the original application for this patent, but were added subsequently on August 6, 1927, unsupported by a supplemental oath. Hence, appellant argues that the latter date was the earliest one on which Klein and Szegvari had been shown to have knowledge of the alleged invention disclosed by the claims now in issue. There is no doubt that a patentee's invention may be broader than the particular embodiment shown in his specification. A patentee is not only entitled to narrow claims particularly directed to the preferred embodiment, but also to broad claims which define the invention without a reference to specific instrumentalities. Smith v. Snow, 294 U. S. 1, 55 S.Ct. 279, 79 L.Ed. 721. It seems that a patentee is entitled to broaden the scope of his claims during the prosecution of his application so long as the broadened claims are fairly supported by the disclosures of his original application. There is no contention here that the original application was ever materially altered, and we have no doubt that the subject matter of the claims added on August 6, 1927, was fairly disclosed by the original application. In such event a supplemental oath was not essential to the validity of the new claims.

We think the District Court correctly ruled that the Klein patent was not broadened illegally; that the claims added on August 6, 1927, are not broader than the original specification warrants, and that the addition of the claims now in suit did not limit the patentee to the later date as the earliest filing date of the added claims.

Appellant further contends that the Twiss patent is invalid because it is not entitled to a date of invention earlier

than Hauser's publication on July 22, 1927; and that if it is entitled to the date of its counterpart, the first British patent, it is invalid because of the provisions of section 4887 of the Revised Statutes, 35 U.S.C.A. § 32. We think this contention is fully met by the District Court's finding number 9. That finding fixes October 22, 1926, as the filing date of this patent, and we think it is amply supported by the record.

We are convinced that the claims relied upon in both patents are valid and infringed, as found by the District Court.

Decree affirmed.