Serge A. SCHERBATSKOY, Plaintiff-Appellant,

v.

UNITED STATES STEEL CORPORATION and Sperry Rand Corporation, Defendants-Appellees.

No. 13129.

United States Court of Appeals Seventh Circuit.

March 9, 1961.

Dugald S. McDougall, Chicago, Ill., Charles G. Bomberger, Hammond, Ind., for appellant.

William J. O'Connor, Hammond, Ind., Edwin T. Bean, Buffalo, N. Y., Bean, Brooks, Buckley & Bean, Buffalo, N. Y., Galvin, Galvin & Leeney, Hammond, Ind., for appellees.

Before DUFFY, KNOCH and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

Serge A. Scherbatskoy, plaintiff-appellant, as assignee of Jacob Neufeld's Patent No. 2,496,103, brought suit in the District Court charging Sperry Rand Corporation and its lessee, United States Steel Corporation, defendants-appellees, with infringement and seeking an accounting and damages. The defendants by their Answer and Counterclaim for Declaratory Judgment asserted invalidity of the patent and denied infringement. On trial of the issues before the District Court the charge of infringement was limited to Claims 1, 2 and 8 of the patent in suit. The District Court filed an opinion containing its findings of fact and conclusions of law and entered judgment that Claims 1, 2 and 8 of Pat-

ent No. 2,496,103 were valid but not infringed. Plaintiff appealed.

The patent in suit relates to an indexing and speed control system for magnetic reproducers. The accused devices are magnetic-tape circuits and apparatus which form a part of the UNIVAC electronic computers and File Computers manufactured by Sperry Rand Corporation, the primary defendant.[1] United States Steel Corporation is a defendant by reason of its having leased and used a UNIVAC computer at its Gary, Indiana, plant.

The Claims in suit are as follows:

"1. An apparatus for moving a physical medium, said physical medium having impressed thereon a signal, comprising a pick-up element mounted in operative relation to said medium for translating said impressed signal into an electric current, and means responsive to said current for controlling the relative motion between said medium and said pick-up element, and another means responsive to said current for indicating the displacement between said medium and said pick-up element."

"2. In combination, a movable magnetizable member having magnetically impressed thereon a signal, a reproducing head mounted in operative relation to said member for translating said impressed signal into an electric current, means responsive to said current for controlling the relative motion of said member with respect to said reproducing head, and another means responsive to said current for indicating various portions of said member."

"8. A reproducer system for reproducing signals from a movable physical medium, said medium having impressed thereon two signals differing one from another by distinguishable characteristics, the first

1. Hereinafter referred to as defendant.

of said signals being recurrently distributed with respect to said medium, comprising a pick-up element mounted in operative relationship to said medium for translating said two impressed signals into two corresponding electrical currents having distinguishable characteristics, the first of said currents corresponding to the first signal varying recurrently with respect to time, means connected to said pick-up element and providing two channels for separating said two currents, an indicating element operated in relationship to a selected initial instant and responsive to the first of said currents for indicating at any moment the number of recurrences of said first current that have elapsed since said initial instant, and a reproducer responsive to said second current for reproducing said second current."

The District Court found that each of these claims define a true combination of elements which cooperate together to achieve new and useful functional results; in the case of Claim 8, the important new result being precise indexing of information reproduced from tape. Its findings on the issue of infringement and conclusion that the accused devices did not infringe are grounded on differences the court found present in the accused devices as to means, operations and results.

The plaintiff contends the grounds or differences relied upon by the District Court in support of its judgment are legally unsound and arise from a basic error—that of measuring the invention by the specification rather than the claims.

The specific embodiment described in the specification and illustrated in the patent's drawing related to an acoustical or sound system in which a repetitive signal magnetically impressed upon the recording tape is utilized by the reproducing apparatus to control, through employment of synchronous motors, differential gearing and a rheostat, the speed of the driving motor which pulls the tape through the reproducing head or pick-up so that the tape is moved at substantially the same varying and increasing speed as occurred during the recording process (because of build-up in diameter of the tape on the reel during recording) with the result that the sound signal also magnetically impressed on the tape is reproduced through a speaker without the distortion which otherwise would result. The cyclical reference signal is superimposed on the sound signal at a different electrical frequency from the sound signal and filters are employed to separate the currents reproduced and employ each for the purpose intended. The recording and reproducing apparatus each include a counter which counts and indicates the number of reference signals and affords precise indexing of any segment of the sound or speech recorded on the tape.

The defendant's accused devices utilize magnetic tape for recording and reproducing information rather than sound or speech. The recorded information signal represents numerical and alphabetical data on which computations and calculations are made. The charge of infringement is limited to that part of the apparatus whereby information is taken from a magnetic tape and fed into the computer proper.

Numerical information to be processed by the UNIVAC computer is first recorded on magnetic tape in the form of a code. Each numeral or other character is represented by a group of tiny magnets distributed across the width of the tape in seven laterally spaced parallel channels, the magnets representing each succeeding character being spaced slightly (less than 0.01 inch) down the length of the tape from the magnets representing its predecessor.

Each magnet is known in UNIVAC parlance as a "bit". For a given character the segment of tape length on which it is recorded will have a magnet or "bit" in some but not all of the seven signal channels, the identity of the char-

acter being determined by which of the channels contain "bits" in that particular segment of tape length and which do not.

Information is recorded on the tape in groups of characters, one group being "digested" by the computer circuits before the next is fed in. In the large UNIVAC computers, these groups consist of 720 characters, such a group being referred to as a "block", and occupying about six inches of tape. In the smaller UNIVAC model, known as the "File-Computer", the unit of information consists of 120 characters and is called a "blockette", occupying slightly less than one inch of tape. The blocks are spaced apart on the tape, about 2.5 inches of tape being left blank between the end of each block and the beginning of the next.

In addition to the seven parallel channels of tiny magnets or "bits" which form the coded characters (numerals, letters, etc.), the UNIVAC tape contains an extra channel known as the "sprocket channel", in which a magnet or "bit" appears at each character position. That is, throughout the length of each block or blockette, as the case may be, the bits in the sprocket channel are uniformly, repetitively distributed along the tape. This sprocket channel is not a part of the information signal; it serves, in the UNIVAC system, as a reference signal.

In the UNIVAC computers, the coded information magnetically recorded on the tape is translated into electrical current pulses by passage of the tape through a pick-up head, referred to as the "read-write" head. This is a multiple-channel device that produces, as the tape moves through it, trains of electric current pulses representing the coded numerical information; it also produces a train of other electric current pulses, called "sprocket pulses", that correspond to the magnetic bits or tiny magnets in the sprocket channel on the tape. The tape moves at a uniform speed throughout the reproduction of a block of information and the sprocket bits thus generate in the read-write head an electric current uniformly repetitive throughout the reproduction of each block.

The current pulses representing the coded numerical information in a block of UNIVAC tape are "stored" temporarily after they are taken from the pick-up head, until the computing circuits are ready to receive them. The apparatus used for this pulse "storage" consists of six electrical devices called "tanks", each of which has a capacity of 120 characters—ten groups, known in UNIVAC parlance as "words", of twelve characters each.

As any given block of information is translated into electric pulses by the read-write head, the pulses thus formed are initially fed or routed into the first storage tank, until a total of 120 characters has been stored in it. Thereupon, the circuit is automatically switched to the second storage tank, and the next group of 120 characters is fed into and stored in that tank. The circuits are then automatically switched over to the third tank, and so on, until the entire 720 characters in the block have been stored, 120 characters in each of the six tanks.

The automatic switching operations just described are, in the UNIVAC system, controlled by counting of the sprocket pulses. That is, as the sprocket pulses are generated by passage of the reference signal on the tape through the read-write head, they are counted by an electronic counter. When the count of sprocket pulses, following the beginning of a block, reaches a total of 120, the first tank-switching operation automatically occurs. When the number of counted sprocket pulses totals 240, another switching operation occurs, shifting the information signals from the second storage tank to the third storage tank. This procedure is repeated until each of the six tanks has received and stored its full complement of 120 information-signal characters.

Thus, the reference signal is utilized to perform the vital function of switching the information-signal circuits at precisely the correct tape positions to route the coded characters into the proper storage tanks.

In normal operation, the sprocket counting and the resulting switching proceed automatically, but the machine does provide, by a neon-light system, a visual indication showing at each instant the total number of sprocket pulses counted since the beginning of the block.

When the last of the input storage tanks has been filled the information input must be temporarily stopped, to give the computing circuits time to "digest" the information stored in the tanks and thus clear the tanks for receipt of a new block of information. This is done by physically stopping the tape when all the magnetically recorded information in a single block has been reproduced, and it is accomplished under the control of the sprocket channel—i. e., the repetitive or cyclical reference signal recorded on the tape. When the total of sprocket pulses counted by the electronic counter reaches 720, the tape-driving motor is shut off and the tape movement stops.

If all is well, the tape stoppage is only momentary. Should the electronic counter register, however, at the end of a block, a sprocket-pulse count that differs from 720, either more or less, the tape-driving motor starts up in the opposite direction, the tape reversed, and moved back to its original position at the beginning of the block. Then, again under the control of the sprocket pulses, the tape-driving motor starts up in its original direction and the tape once more passes the read-write head.

If, on this so-called "automatic re-read", the electronic counter registers a correct count of 720 sprocket pulses, the operation proceeds normally thereafter. On the other hand, if an incorrect count is still registered on the first re-read, the re-reading operation is repeated, up to a total of five re-reads. If, the counter still fails to register the correct count of 720 sprocket pulses, then the machine stops and a warning signal is actuated, signalling the operator that something has gone wrong.

The operation of the smaller UNIVAC "File-Computer" is essentially the same, so far as the sprocket channel and its functions are concerned. The main difference between the two systems lies in the fact that the tape of the File-Computer has information recorded on it in "blockettes" of 120 characters, rather than in blocks of 720 characters.

Over and beyond the sprocket-channel functions which the File-Computer has in common with the large UNIVAC, it also utilizes the sprocket channel to maintain a running indication of the total number of blockettes that have passed through the read-write head from the beginning of any particular tape-reading operation. This is accomplished by a second electronic counter, known as the "automatic blockette counter", which serially counts the first sprocket pulse in each blockette, counting forward and backward as the tape moves forward or backward.

The reference signal or sprocket pulse is thus employed for varying functions none of which result in control of the speed at which the tape is moved through the reproducing head or is for the purpose of enabling the operator to locate the portion of the tape carrying a particular segment of information.

■■ The claims in issue are combinations of elements old in the art and the novel features relied upon to endow the combination with the quality of invention are the control over relative motion of the tape and the indexing of its content through the use of the uniformly recurrent reference signal accompanying the sound or information signal on the tape. Although the claims, not the specification or drawing, define the invention, American Anode, Inc. v. Lee-Tex Rubber Products Corp., 7 Cir., 136 F.2d 581, it is also true that "claims should be construed in the light of the specification and the drawings", Everest v. Duke, 7 Cir., 139 F.2d 22, 24. And, in the instant case, recourse to the specification and drawing was proper, if not necessary, to determine the concept intended by "relative motion", "indicating the displacement", "indicating various portions"

and "distinguishable characteristics" in the context in which such phraseology was employed. Cf. Permo, Inc. v. Hudson-Ross, Inc., 7 Cir., 179 F.2d 386, 388; Grubman Engineering & Mfg. Co. v. Goldberger, 2 Cir., 47 F.2d 151.

Findings of fact made by the District Court on the subject of differences between the accused devices and the claims in suit interpreted in the light of the specification and drawing included differences in means, operations and result.

Both of the accused devices utilize a uniformly recurrent reference signal to achieve the functions and results desired of it in each instance. But, apart from dissimilarity in means and operations, the results sought and obtained are wholly different from those of the claims in issue. Neither control of speed of the tape nor ascertainment of location of particular content result from use of the reference signal in the tape reproduction apparatus employed as a part of UNIVAC and the File Computer. The following specific findings were made with respect to the "result" factor alone:

"18. In the accused UNIVAC and File-Computer, the tape is moved through the Read-Write Head intermittently, and at a uniform speed. The problem of moving the tape at the same varying speed during reproduction, as during recording, does not exist in the accused structures, and the lineal speed of movement of the tape during reading or reproduction therein has no relationship to the lineal speed of movement of the tape during recording.

\*　\*　\*　\*　\*　\*

"23. The current established by the UNIVAC and File-Computer sprocket pulses is not used to control the speed of motion of the tape relative to the Read-Write Head.

\*　\*　\*　\*　\*　\*

"25. The accused UNIVAC and File-Computer sprocket pulse counting system is not used to determine the location of information on the tape, and no visual observation of the sprocket pulse count is made for that purpose. No useful purpose would be served by observing a partial sprocket pulse count in any particular block, or blockette, because the UNIVAC and File-Computer tapes are not programmed for the locating of recorded information in that manner.

\*　\*　\*　\*　\*　\*

"29. The term relative motion, as used in claims 1 and 2 of the patent in suit, has reference only to the speed at which the medium moves past the pick-up element; it does not include starting, stopping and/or reversing the motion of the medium."

"30. The accused UNIVAC and File-Computer structures do not provide means responsive to current derived from an impressed signal to control the relative motion of the tape, in the sense of claims 1 and 2 of the patent in suit.

"31. The means responsive to the current for indicating the displacement between the medium and the pick-up element, recited in claim 1 of the patent in suit, and the means responsive to the current for indicating various portions of the member, recited in claim 2 of the patent in suit comprise the counter used to assist an operator in locating information on the tape."

"32. The accused UNIVAC and File-Computer structures do not provide means responsive to current derived from an impressed signal to indicate the displacement between the tape and the pick-up element, or to indicate various portions of the tape, in the sense of claims 1 and 2 of the patent in suit.

\*　\*　\*　\*　\*　\*

"35. The distinguishable characteristics called for in claim 8 of the patent in suit comprise different frequencies, enabling the separation of currents derived from superimposed signals.

\*　\*　\*　\*　\*　\*

**558**

"38. In the accused structures, the currents produced from the magnetic bits are always separate, and there are no means connected to the pick-up element and providing separate channels for this purpose, nor is there any need therefor.

"39. The indicating element of claim 8 of the patent in suit is for the purpose of locating information on the tape.

"40. The accused structures do not provide an indicating element responsive to the sprocket pulse current for locating information on the tape."

We are convinced that each of these findings has substantial support in the record.

■ To establish infringement there must be identity of means, operation and result. Weil Pump Co. v. Chicago Pump Co., 7 Cir., 74 F.2d 13. The doctrine of equivalents is of no aid to the plaintiff in the instant case. And, as we had occasion to point out in Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co., 7 Cir., 194 F.2d 945, 947:

"Of course, in determining whether an accused device infringes a valid patent, resort must be had in the first instance to the words of the claim, but as we said in Flowers v. Austin-Western Co., 7 Cir., 149 F.2d 955, 958, mere application of claim phraseology is not alone enough to establish infringement, nor is similarity of result. There must be real identity of means, operation and result. See also Jogger Mfg. Corp. v. Roquemore, 7 Cir., 118 F.2d 867."

■ From our review of the record we are of the opinion that the District Court's findings of fact on the issue of infringement have substantial support, are not clearly erroneous, and that its conclusions of law with respect to infringement are applications of correct legal criteria.

The judgment order of the District Court is affirmed.

Affirmed.