Reeford P. SHEA and Preco, Incorporated, Plaintiffs-Appellees,

v.

BLAW-KNOX COMPANY, Defendant-Appellant.

No. 16258.

United States Court of Appeals Seventh Circuit.

Jan. 10, 1968.

Rehearing Denied March 4, 1968.

Jerome F. Fallon, Chicago, Ill., Walter J. Blenko, Sr., Walter J. Blenko, Jr., Paul Bogdon, Pittsburgh, Pa., for appellant, J. I. Dilsaver, Mattoon, Ill., Wm. Henry Venable, Blenko, Leonard & Buell, Pittsburgh, Pa., of counsel.

R. Douglas Lyon, Lyon & Lyon, Los Angeles, Cal., for plaintiffs and appellees.

Before SCHNACKENBERG, CASTLE and FAIRCHILD, Circuit Judges.

CASTLE, Circuit Judge.

Blaw-Knox Company, the defendant-appellant, prosecutes this appeal from the judgment order of the District Court adjudicating that Claims 1 and 3 of Shea U. S. Patent No. 3,029,716 are valid and have been infringed by the defendant, and granting injunctive relief against further infringement. The patent in suit is owned by the plaintiffs-appellees, Reeford P. Shea and Preco, Incorporated. It relates to a paving machine control system.

The record discloses that for many years mechanical paving machines of the "floating screed" type, exemplified by the long-expired Barber U. S. Patent No. 2,138,828, have been used for the surfacing of highways with bituminous material. Generally, the floating-screed type pavers employ a flat plate or "screed" which is towed behind a motivating means, such as a tractor, with the paving material being dumped from a hopper in advance of the plate. This screed functions to iron the dumped material to form the smooth upper surface of a paved road. The screed is supported solely by the material having already been deposited and operates at a slight positive angle of attack. The thickness of the mat of road material laid varies with the adjustment of the angle of the screed. As the angle of attack is changed, the screed will either gradually rise until an equilibrium is attained or gradually sink until an equilibrium angle of attack is restored. As the paving machine moves along the road, if high or low spots in the subsurface or grading are encountered the screed creates a corresponding rise or dip in the surface of the mat being laid unless the roughness is short enough to be bridged by the wheels or tracks of the towing vehicle or some form of correction of the angle of attack is made.

In the machine illustrated in the patent in suit, the machine of the Barber patent, and in defendant's accused machines, the free-floating screed is connected to the tractor by "side" or "draft" arms, and provision is made for the adjustment of the angle of attack of the screed. The specification of the patent in suit recognizes that preexisting paving machines (such as the machine of the Barber patent) controlled the level of the mat surface produced by variation of the inclination of the screed in the direction of travel; that means were provided for the manual adjustment of each end of the screed to vary screed inclination; and that the screed is torsionally flexible about its longitudinal axis sufficiently to permit different settings at the two ends of the screed. The specification recites that "[i]n the normal operation of such machines, the operator varies those adjustments simultaneously in the same direction to control the general thickness of the mat [thereby achieving some measure of longitudinal slope or grade control], and varies them differentially to

control the lateral slope of the mat surface [to achieve transverse slope control]". But, as the evidence herein discloses, merely changing the angle of attack of the screed does not instantaneously alter the thickness of the mat being laid to compensate for the variation in subsurface transverse slope encountered. The mat thickness will gradually change as the machine progresses from the point where the adjustment was made to alter the angle of attack, either increasing or decreasing in the shape of a wedge until a new state of equilibrium is effected. The problem of lateral or transverse slope control to which the patent in suit was addressed was the need to anticipate that the screed was going to make a mistake (lay a surface reproducing a subsurface irregularity) and to compensate for the same before any appreciable error occurred.

Claim 1 of the patent in suit defines a structure embracing a combination of eight elements. These components combine to produce a structure capable of anticipating the existence of a subsurface irregularity forward of the approaching screed, which condition would produce error in the desired transverse slope of the mat being laid, and signalling the correction in screed angle[1] required to prevent the occurrence of appreciable error. Claim 3 contains the further limitation that the correction is automatically made.

Illustrative of the claimed invention, but "not as a limitation" upon the scope of the claims, the specification and drawings describe and show a Barber patent type floating-screed paving machine in which, however, the draft arms are pivoted at their forward or tractor ends rather than at the screed. In Shea a crossbeam or gantry arm is placed on the machine forward of the screed and pivotally connected with arms extending from the side frames of the screed to the gantry arm. The gantry arm structure geometrically forms and represents a lineal extension or forward projection of the screed. A

sensing pendulum is mounted on the gantry arm. When the tractor encounters an irregularity in subsurface slope the crossbeam of the gantry arm tips or tilts, and the gantry arm would be representative of the axis of the screed when it got to that position in the future. By means of electrical components and circuitry the pendulum is utilized to create an electrical impulse which indicates the degree and direction of pivoting of the gantry arm and hence the forward projection of the screed. This electrical impulse or signal is electrically compared with a predetermined signal representing the desired transverse inclination of the screed to create the desired transverse slope of the road. The resulting output of the two signals is either visually displayed on an indicator as a guide to the operator in making a corresponding correction in angle of the screed by use of the adjustment means so as to compensate for the anticipated irregularity, or it is utilized through a bridge circuit to drive an electric motor to vary the angle of attack of one pre-selected end of the screed to overcome the effect of the subsurface irregularity on the transverse slope of the mat. This automatic correction is substantially instantaneous and operates to anticipate and to make, without intervention by the operator, the needed change in screed angle so as to prevent the occurrence of appreciable error in the transverse slope of the material being laid.

The defendant asserts invalidity of the patent in suit on the ground of anticipation in the prior art; contends its accused machines do not infringe because they lack the element of a "forward projection of the screed", and because the only things they have in common with the structure of the patent are elements in common with prior art; and claims that the patent is unenforceable because of its misuse by plaintiffs.

The defense of invalidity is primarily based on two prior art patents, Waldvogel British Patent No. 397,882, and Adams U. S. Patent No. 2,284,550, not cited by

---

1. Both Claims 1 and 3 contain a limitation that there be power means for driving or controlling one of the adjustment means in response to the signal.

the Patent Office examiner. On the basis of the disclosures of these patents, and of the cited Barber patent, the defendant argues that the Shea patent is but a congregation of elements old in the art which performs no new function and achieves no new result. Defendant asserts that Shea did no more than to put a plumb bob forward of the screed of an old and well-known paving machine to measure and visually indicate the transverse inclination of the screed—an obvious arrangement.

In this connection the District Court found that the claims in suit teach a combination of elements wherein the transverse inclination of the screed is compared with the transverse inclination of a forward projection of the screed to anticipate a condition which will result in an appreciable error in the transverse slope of the mat surface and correct same before such error can occur; and that neither Barber, Waldvogel, nor Adams contains a disclosure or teaching of such a combination, or of any device capable of obtaining the result thereof, or capable of automatically controlling the transverse slope of the mat of material deposited on a roadway. These findings are amply supported by the record.

Waldvogel discloses means for manually adjusting the height or inclination of the screed on a paving machine; a sighting device affixed to the frame of the machine and adjustable to a leveling rod to make it possible to adjust the thickness of the surface layer; and a water level with a scale which shows whether the frame is exactly horizontal or has the desired inclination. But Waldvogel neither discloses nor teaches the feature of anticipation embodied in Shea, nor a device capable of automatic correction of screed angle to achieve desired slope control.

Adams discloses a grader with a self-leveling scraper blade. It teaches the use of a pendulum, heavily weighted or in combination with a reversible electric motor, to automatically maintain the scraper blade in a level position, transversely of the direction of movement of the grader, irrespective of the transverse slope of the area being leveled. A departure of the blade from the desired level position causes the pendulum to effect the closing of a circuit of electrical current which actuates a motor to swing an arm which restores the blade to a level position. Adams does not disclose or teach the use of a sensing device to anticipate a needed change in the position of the blade. Adams merely restores the position of the blade to a norm after the blade has been displaced.

The record discloses nothing by way of prior art which anticipates the novel feature of Shea. Nor does the record warrant a conclusion that it would have been obvious to those skilled in the art to employ Shea's concept of a geometrical forward projection of the screed to anticipate a need for alteration of screed angle to prevent the occurrence of appreciable error in the transverse slope of the mat at the point of such forward projection. The District Court did not err in holding Claims 1 and 3 of the patent valid.

Defendant's defense of non-infringement is based on its contention that its accused machines do not, in addition to the draft arms which tow the screed, employ the side arms shown in the Shea patent drawings and which serve to connect the side frames of the screed with brackets at the forwardly placed gantry arm on which the ends of the gantry beam is mounted. Defendant equates the element "forward projection of the screed", called for in the claims in suit, with these side arms, and claims non-infringement by reason of the omission of these side arms in the structure of the accused machines. But, in this respect, the defendant mistakenly interprets the claims. The side arms do project forwardly from the screed. However, the language "the forward projection of the screed" as used in the claims is to be construed in the light of the specification. Minnesota Mining and Manufacturing Company v. Technical Tape Corp., 7 Cir., 309 F.2d 55, 58; Scherbatskoy v. United States Steel Corp.,

7 Cir., 287 F.2d 552, 556. When so construed it is clear that this language is not used to identify the side arms. The side arms do not constitute the "geometrical" forward projection of the screed specifically referred to in the specification. It is this "geometrical" projection reflected by the forward placement of the gantry crossbeam and its related structure which serves to "sense" the correction needed at that point. And, this is the novel feature of the Shea patent. The testimony of record fully sustains the District Court's finding that the automatic slope control installed by the defendant on its accused machines embodies the combination defined by the claims in suit.

All of the manufacturers of pavers utilizing a floating screed with automatic transverse slope controls, with the exception of the defendant, have become licensed under the patent in suit and have paid substantial royalties to the plaintiffs. In each case the license agreement embraces not only the patent in suit but also grants a license under an earlier Shea et al. U. S. Patent No. 2,893,134.[2] Each of the agreements provides for a royalty payment of $250 for each unit made, used or sold by the licensee falling within a claim or claims of either of the patents. Each of the agreements originally contained a clause which the defendant contends precluded a licensee from dealing in unpatented goods contrary to 15 U.S.C.A. §§ 1, 2 and 4. On January 20, 1965, in a letter addressed to each of the licensees, the plaintiffs waived compliance with the clause in question. The defendant predicates patent misuse barring enforcement of the patent upon alleged compulsory package licensing, and upon its interpretation and characterization of the clause which was subsequently waived as being within the doctrine of Mercoid Corp. v. Minneapolis Honeywell Regulator Co., 320 U.S. 680, 684, 64 S.Ct. 278, 88 L.Ed. 396.

In connection with the misuse defense the District Court made findings, which are supported by substantial evidence, that the plaintiffs never conditioned the granting of a license under the patent in suit upon acceptance of a license under Patent No. 2,893,134; that plaintiffs have always been willing to grant a license under the patent in suit individually; that no one, including the defendant, has ever requested a license solely under the patent in suit; and that the clause relied upon by defendant as constituting an unlawful restriction had been voluntarily waived by the plaintiffs.

■ Since the clause assailed as violative of the anti-trust statutes was for the benefit of the plaintiffs they could voluntarily waive the provision (Westinghouse Electric Corp. v. Bulldog Electric Products Co., 4 Cir., 179 F.2d 139), and the District Court did not err in concluding that by such a waiver the plaintiffs had purged themselves of any possible patent misuse as a result of the clause complained of by the defendant. Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 835–836, 70 S.Ct. 894, 94 L.Ed. 1312.

■ The record does support defendant's contention that the plaintiffs demanded a $250 per unit royalty on machines embodying the combination defined by the claims in suit irrespective of whether or not a license under Patent No. 2,893,134 was also desired. But this, in and of itself, does not constitute compulsory package licensing upon which misuse barring enforcement of the patent can be predicated. There was no conditioning of the license grant upon the acceptance of another and different license. Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312; Apex Electrical Manufacturing Company v. Altorfer Bros. Company, 7 Cir., 238 F.2d 867, 871–872. See also Hazeltine Research, Inc. v. Avco Manufacturing Corporation, 7 Cir., 227 F.2d 137, 147. Neither American Securit Co.

2. The evidence establishes that this additional patent was included in the licenses at the request of the licensees.

v. Shatterproof Glass Corp., 3 Cir., 268 F.2d 769, relied upon by the defendant, nor our recent decision in Hazeltine Research, Inc. v. Zenith Radio Corporation, 7 Cir., 388 F.2d 25 is apposite here. In American Securit (268 F.2d 769, at 777) the misuse condemned was predicated upon the situation where the patent owner "compels a licensee to accept a package of patents or none at all"— where one patent is employed as a lever to compel the acceptance of a license under another. In our recent opinion in *Hazeltine* both *Avco* and *Apex*, supra, are distinguished, and there was found to have been a demand of a greater royalty for a license under nine color television patents than for a package license covering all of the owner's patents, color and monochrome, extant and future. This demand was in the form of a final offer of license which had followed previously made single, multiple, and package offers which, on the facts and circumstances presented, were found to constitute "an attempt by economic coercion to force the taking of the package".

The judgment order of the District Court is affirmed.

Affirmed.