ARROW PETROLEUM CO. v. JOHNSTON.
No. 9173.

Circuit Court of Appeals, Seventh Circuit.
June 2, 1947.

Rehearing Denied July 9, 1947.

Joseph B. Fleming, David Jacker, Joseph H. Pleck and Edward C. Caldwell, all of Chicago Ill., J. N. Saye, of Longview, Tex., and John M. O'Connor, Jr., (of Kirkland, Fleming, Green, Martin & Ellis), of Chicago, Ill., for appellant.

John H. Bishop and Robert J. Burdett, both of Chicago, Ill., for appellee.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

Plaintiff, referred to here as "Arrow," sued the defendant, Johnston, on November 13, 1943, to recover damages for an alleged breach of contract. By this written contract, entered into by the parties on September 6, 1941, Arrow agreed to purchase from Johnston approximately 187,000 barrels of No. 6 fuel oil. Each barrel was to contain 42 gallons, and the price to be paid by Arrow was 85 cents a barrel, plus 1.19 cents a gallon for transportation by barge from Vicksburg, Mississippi, to Lockport, Illinois. There had been an earlier contract between the same parties dated May 14, 1941, for 225,000 barrels of oil, under which 37,935.96 barrels were received. Johnston had repudiated this earlier contract, and the contract of September 6, was for the undelivered portion of the earlier contract. By March 6, 1942, Johnston, in compliance with the later contract, had delivered to Arrow 76,502.14 barrels of oil, for which Arrow had promptly paid him.

The controversy here involves the matter of demurrage. As to this issue the later contract contains the following provisions:

"4. Transportation charges * * *. Responsibility for picking up loaded barges at Lockport, is to be upon Arrow * * *, and as to any time lost awaiting pick-up of loaded barges—same is to be added to unloading time allowed, which is six hours hook-up plus 1,000 barrels per hour.[1] E. C. Johnston agrees to supply the necessary barges, tow-boats, etc., to transport said oil from Vicksburg, Miss., to Chicago (Lockport, Illinois), without cost, other than as herein specified.

"5. It is understood that Arrow * * * shall not be responsible for delays in unloading caused by faulty equipment. Demurrage shall be charged at the rate of $2.00 per hour for the first forty-

---

[1] Reduced to 750 barrels an hour by mutual written agreement on September 18, 1941, in order to cure an inadvertent error.

eight hours, and $4.00 per hour thereafter. * * *

* * * * * *

"8. Tug demurrage hereunder for delay is to be based upon Horse Power of tow boats, to be figured on the following basis: At the rate of $12.50 per hour on tow boats of 750 Horse Power, and more or less at same rate per Horse Power in proportion to the Horse Power of tow boat involved."

In the course of oil deliveries from Vicksburg to Chicago, delays occurred in unloading barges by Arrow. Because of these delays, Johnston billed Arrow for a total demurrage of $4,433.66. Of this amount, $386.33 was for deliveries made under the previous contract. The remainder was under the demurrage clauses of the contract of September 6. Arrow did not pay the demurrage thus claimed and billed by Johnston, because the former asserted that the delays in unloading had been caused by faulty barges furnished by Johnston, and for the further reason that the six hour hook-up time allowed by the contract was to be granted to each barge in a tow, rather than for the tow as a whole, as asserted and claimed by Johnston.

On April 2, 1942, Johnston wired Arrow that he considered their agreement of no further force and effect because it had breached their contract by not paying demurrage as invoiced and requested by him. In response thereto Arrow wired Johnston:

"We have never refused to pay demurrage caused by our inability to unload as covered in contract. We have covered in writing each delay caused by faulty equipment, and have awaited credits covering such cases. We are willing to pay adjusted charges in conformance with contract. Imperative that we receive shipments to meet federal government obligations. If shipments do not come forward immediately it will necessitate our buying on outside, charging you the differential loss."

On April 24, 1942, Johnston wired Arrow:

"When you refused to pay the accrued demurrage on barges, you breached your contract with me, and relieved me from further obligation to perform thereunder. You ended the contract, and its terms are no longer binding upon me. Demand is hereby made upon you for $4,433.66 demurrage charges."

Thereupon, Arrow, by this complaint, sued Johnston for the difference between the contract price and the market price in Chicago of the 110,561.90 barrels (4,643,-599.80 gallons), still undelivered by Johnston. Without admitting liability Johnston agrees with Arrow that this price differential is correct.

The defendant moved to dismiss the complaint, for lack of material facts, which was overruled. He moved for a pretrial conference. He then filed an answer in two paragraphs accompanied by a counterclaim. The first paragraph of answer alleges that the complaint fails to state a claim upon which relief can be granted. The second paragraph avers that Arrow failed to provide facilities by which oil could be discharged at its terminal at the rate of 750 barrels per hour; that Arrow ignored Johnston's requests for payment of demurrage prior to the latter's declaration that he considered the contract no longer effectual; that the barges and tugs were unnecessarily detained by Arrow in excess of the unloading time allowed, thereby unnecessarily depriving Johnston of their use, thus impeding and obstructing him in his production and marketing of oil. He denied that any delays of Arrow in unloading, over free time, were caused by Johnston's faulty equipment, or that Arrow advised him of that fact. He asserted that his failure to deliver oil was due to causes beyond his control, but did not specify such causes other than Arrow's failure to provide unloading facilities which would discharge the oil at the rate of 750 gallons per hour. He alleged that he abandoned the contract because of Arrow's refusal to pay demurrage thereunder.

The counterclaim alleges that Johnston was induced to enter into the contract of September 6, 1941, by Arrow's promise to improve its unloading facilities, so that it could discharge the oil at 750 barrels an hour. On information and belief, it was alleged that Arrow did not thus improve its unloading facilities. By reason of these

facts, Johnston claims damage by way of demurrage to the extent of $4,433.66, and for the further sum of $25,000 because Arrow's failure to unload the oil within the time allowed deprived Johnston of the use of the barges, thus preventing him from operating his refinery at maximum capacity and from transacting such business to the fullest extent.

On December 15, 1944, this cause was set for pretrial conference, and at that conference Arrow, on December 21, 1944, was ordered to reply to the answer and counterclaim, and in the alternative to move to strike portions of those pleadings, and both parties were ordered to support by briefs their contentions with respect to Arrow's alternative motion to strike.

On January 10, 1945, Arrow filed its replies to the answer and counterclaim, together with its alternative motions to strike all or portions of each of those pleadings, for the respective reasons that the allegations of the answer did not constitute a defense to the complaint, and that the allegations of the counterclaim did not constitute a cause of action, other than as to the alleged demurrage of $4,433.66. On January 16, 1945, defendant demanded a jury trial.

Subsequently, on February 17, 1945, prior to the court's ruling on the motions to strike, Johnston filed an amendment to his answer by which he sought to read into the above quoted demurrage clauses an express oral undertaking of Arrow to unload 750 barrels an hour, and a promise of Arrow to install pumping equipment capable of pumping that much per hour. He further alleged therein that Arrow's nonpayment of the demurrage was a repudiation of a material part of the contract and indicated an intention on the part of Arrow to no longer be bound thereby.

Thereupon, on November 5, 1945, Johnston moved to file a third defense by way of an amendment to his amended answer. The court permitted it to be filed on the theory that it had no discretion to refuse it. However, the court required such answer to be under oath and requested authorities on the question of discretion. This amended answer was filed on November 15,

1945, and on November 27, 1945, Arrow moved to strike the third defense.

This third defense alleges an oral agreement between the parties on November 12, 1942, whereby they mutually agreed that the contract of September 6 should be abandoned and rescinded, Johnston releasing Arrow from liability to accept and pay for further shipments of oil and for any liability under the contract, except accrued demurrage. It further alleges that Arrow thereby released Johnston from any liability to make further shipments of oil and from all liability under the contract. It then alleges that at the same time, Arrow and Johnston entered into an oral contract under which Johnston obligated himself to deliver to an affiliate of Arrow an amount of crude oil equal in amount, barrel for barrel, to the fuel oil remaining undelivered under the contract of September 6, 1941. The crude oil was to be delivered by Johnston in East Texas, Louisiana and Mississippi, with the understanding that arrangements were to be made for tank car shipments to Centralia, Illinois, in the most economical manner. It further alleges that Johnston has at all times been ready, willing and able to fulfill the later contract but that this suit was filed the next day in apparent repudiation thereof; nevertheless, it is alleged that the contract of September 6, was rescinded and could not be revived except by mutual assent of both parties.

Arrow's motion to strike this third defense was based on the grounds that no diligence was shown with respect to its filing, that its filing was within the discretion of the court, and that it was frivolous and insufficient in law for the following reasons: (a) no consideration was shown for the rescission of the contract of September 6; (b) the defense alleged was within the provisions of Section 4 of Chapter 121½ of the Illinois Revised Statutes; (c) the defense alleged was within the provisions of the Illinois Statute of Frauds and Perjuries; (d) no consideration was shown for the release of Johnston from his obligations under the contract of September 6.

On December 12, 1945, the court set aside the third defense and struck it from the

files. On the next day Johnston asked leave to file an amended third defense, not under oath, which was substantially the same as the former, except that it set forth certain alleged reasons for the delay in filing the former, and in a more specific manner set forth the terms of the alleged oral agreement of November 12, 1942. This amendment was not permitted to be filed.

Thereafter, on December 13, 1945, nunc pro tunc as of October 2, 1945, the court sustained Arrow's motion to strike Johnston's first amended answer, referred to as his second defense, and so much of his counterclaim as sought to recover more than his claim for demurrage. The order further stated—"* * * only two issues remain to be determined herein, viz:

"(a) The amount of damage, if any, which plaintiff is entitled to recover from defendant under the complaint * * *; and

"(b) The amount of demurrage, if any, which defendant is entitled to recover from plaintiff under the counterclaim * * *.

"It is therefore Ordered that this cause stand for trial upon the issues under the complaint and counterclaim as hereinabove fixed and limited. * * *"

On March 18, 1946, the cause was ordered held on call for trial.

On March 25, 1946, Johnston moved to vacate the last order, and to withdraw his counterclaim without prejudice. These motions were denied. After argument of the case, the court adhered to his former ruling and stated that the amount of the demurrage was the only question left for determination. The parties then informed the court that they felt that they could agree upon the amount of demurrage and upon the amount of damages, and it was agreed by the parties and the court that a judgment order would be prepared embodying such agreements as to damages and demurrage and later presented to the court.

Subsequently, by oral stipulation to the court, it was agreed that the amount due Arrow under the complaint, if any, was $42,336.58, and that the demurrage owing by Arrow was $2,990.62. The stipulation contained certain limitations which are set forth in the judgment hereinafter referred

to. This stipulation caused considerable colloquy in the District Court as to its meaning and why it was made, and the controversy was renewed here. We think a fair statement of Johnston's contention with respect thereto is that rather than have witnesses come from Texas and Mississippi to testify as to demurrage and the market price of oil, he chose to enter into the limited stipulation, and he had no intention to be bound by it in the event the Court of Appeals should reverse the District Court's ruling on the other issues and remand it. In that event Johnston's counsel said,

"we would have a trial and all the witnesses would be there. * * * this stipulation is merely for the purpose of this appeal, you might say, to get certain questions of law settled. We have to have a judgment."

Again,

"I just want to make sure no inferences are to be drawn from this compromise with respect to any allegations made in any pleading."

The Court: "There couldn't be. As I understand the object of the stipulation is merely to avoid a jury trial for the determination of the amount. That is the extent of it, isn't that right?"

Johnston's counsel: "Yes."

It is fair to say that these remarks were made by and to the court prior to the entry of the judgment, but after the court had announced its rulings adversely to the defendant on all the legal issues presented.

Of course, Arrow does not acquiesce in Johnston's interpretation of this oral stipulation, and the court rendered judgment for Arrow for $39,345.98, which was the full amount of its demand less demurrage in the sum of $2,990.62, which the court found that Arrow owed Johnston. This judgment was entered on April 8, 1946.

Inasmuch as defendant urges that there was no trial had in this case, we think it necessary to set forth the material parts of the record of that date:

"And afterwards, * * * on the 8th day of April, 1946, being one of the days of the regular April term of said court, in the

record of proceedings thereof, * * * appears the following entry:

"Judgment Order.

"This cause having come on for trial of the issues remaining following the orders entered herein on December 13, 1945, to which orders the defendant excepts, and the defendant having elected to stand on: (1) his answer as amended * * *; (2) his amendment to the answer as amended filed as a third defense * * *, which was stricken from the files, * * *; (3) his motion *  * * * to file his amended third defense; and (4) his motion * * * to vacate the orders on December 13, 1945, which motion was denied by the court, * * * and the court having ordered on December 13, 1945 that this cause stand for trial on the following issues, namely:

" '(a) The amount of damage, if any, which plaintiff is entitled to recover from defendant under the complaint herein; and

" '(b) The amount of demurrage, if any, which defendant is entitled to recover from plaintiff under the counterclaim herein'; · and the parties hereto being represented in open court by their respective counsel and having agreed as follows:

"(a) As a compromise, to avoid taking evidence, that the amount due and owing from Arrow * * *, to Johnston for demurrage under the counterclaim herein is $2,990.62, which agreement of compromise is without prejudice to either party's right to stand upon and argue for or against the pleadings of the other party as they stand of record; and

"(b) That the damages to Arrow * * *, if any are allowable as a matter of law, from * * * Johnston's failure to complete the contract as charged in the complaint amount to $42,336.58;

" "And the agreements above enumerated, and orders of court to which exception has been taken by defendant, having removed any further issues for determination herein; and the court, being fully advised, Doth Find that Arrow * * * is entitled to recover * * * from the defendant, * * * Johnston, the sum of $39,345.98, after allowance of all credits for demurrage, as and for its damages under the

written contract made an entered into between said parties dated September 6, 1941.

"It is, therefore, ordered by the court that Arrow * * *, do have and recover of and from the defendant, * * * Johnston, its said damages in the sum of $39,345.98, together with its costs herein, and that Arrow * * * have execution therefor; and judgment is hereby entered accordingly."

█ Under these circumstances we think there was a trial, and that the amount of demurrage was definitely and permanently fixed regardless of whether this court affirms or reverses on the other issues. They are in no way materially related, and the evidence relating to such issues is entirely different. Moreover, it is elemental that the court will not try cases by piecemeal, except in cases of interlocutory decrees, of which this is not one.

█ Johnston contends that the court should have sustained his motion to dismiss the complaint because it did not disclose why the delivery schedule of the oil had not been maintained, and failed to state when the deliveries should have been made. There is no merit in this contention. The complaint discloses that all oil received had been paid for; that Johnston agreed to deliver 25,000 barrels each month, and failed to do so, and at the time this complaint was filed, on November 14, 1942, there were past due and undelivered 119,358.14 barrels of oil, and the last shipment was made on February 17, 1942. If all the oil covered by this contract had been delivered promptly at the agreed rate of 25,000 barrels each month, it would have been entirely delivered in March 1942. The complaint would not be defective for failing to state why Johnston failed to make such shipments, for that would be a matter of defense. However, the complaint does disclose the only reason given by Johnston for failing to comply with his agreement, and that is the parties' disagreement as to the amount of demurrage due from Arrow which Johnston, up to the time of the judgment, had maintained was $4,433.66, and which upon the entry of the final judgment the parties stipulated to be $2,990.62.

Johnston further contends that the court erred in overruling his motion to dismiss the complaint because it did not allege that Arrow had performed all precedent conditions required of it, that is to say that it had not paid the demurrage due from it; nor did it allege that Arrow had complied with its alleged contractual obligations to unload the oil at the rate of 750 barrels an hour. We think the payment of demurrage was not a condition precedent, but rather a condition subsequent, of the contract. All that the amendment to the contract did was to decrease the amount of oil to be unloaded in an hour from 1000 barrels to 750 barrels. This provision did not oblige Arrow to unload at that rate, but only subjected it to demurrage if it did not, providing Johnston was without fault with respect thereto, hence Arrow was not required to allege that it had unloaded the oil at the rate of 750 barrels an hour. There was no error in refusing to dismiss the complaint.

Johnston further contends that the court erred in striking its second paragraph of answer with its first amendment. This pleading attempted to defend on the grounds that by express undertaking, and also by oral promise, prior to September 6, 1942, Arrow agreed to unload the barges at the rate of 750 barrels of oil an hour, and upon the further ground that Arrow had orally promised to install facilities capable of unloading 750 barrels of oil an hour, all of which it had failed to do. This subject matter of demurrage is fully treated in the written contract, which appears in the complaint, and it contains no such provisions. It is elemental that all prior or contemporaneous oral agreements with respect thereto are presumed to have been included in the written contract of September 6, 1941, and if they are not so included they will not be permitted to vary its terms. South Florida Lumber Mills v. Breuchaud, 5 Cir., 51 F.2d 490; Sterling-Midland Coal Co. v. Great Lakes Coal Co., 334 Ill. 281, 165 N.E. 793; 3 Williston on Contracts (1936 Ed.) sec. 639. There was no error in striking the second paragraph of answer with its first amendment.

The counterclaim not only seeks to recover demurrage, but also compensation for further damage occasioned by Arrow's failure to improve its unloading facilities so that it could unload the oil at 750 barrels an hour. The court struck only that part of this pleading which relates to the recovery of this alleged extra damage, because it was not mentioned in the written contract. In this there was no error.

Whether there was an express undertaking by Arrow to unload at a given rate must be determined by the written contract, and where the contract fixes the measure of damage, it will govern, both as to method and amount, and additional damages cannot be claimed. Herlihy Mid-Continent Co. v. Sanitary District, 390 Ill. 160, 60 N.E.2d 882; Underground Construction Co. v. Sanitary District, 367 Ill. 360, 11 N.E.2d 361, 115 A.L.R. 57; Restatement of the Law on Contracts, sec. 339(g).

The pleading referred to as the amended third defense relied upon an alleged mutual, oral agreement of compromise which had never been performed either wholly or partly. Shubert v. Rosenberger, 8 Cir., 204 F. 934, 45 L.R.A.,N.S., 1062. It was an alleged mutual agreement to rescind and abrogate a written contract upon which a cause of action had ripened, and was wholly without a new and independent consideration. 6 Williston on Contracts (1936 Ed.) section 1829. Further, it was within the Statute of Frauds, sec. 4 of Chapter 121½, Ill.R.S. and could not be relied upon as a defense so long as Arrow raised the question in its pleadings. Dougherty v. Catlett, 129 Ill. 431, 21 N.E. 932; Wheeler v. Frankenthal, 78 Ill. 124; Sheehan v. Reardon, 223 Ill.App. 365. The filing of an amendment after pleading time has expired is a matter within the sound discretion of the court, and we think that discretion was not abused here. Walden v. Bodley, 14 Pet. 156, 39 U.S. 156, 10 L.Ed. 398; Ætna Casualty & Supply Co. v. Abbott, 4 Cir., 130 F.2d 40; Rule 15(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. There was no error in striking the third defense nor in

afterwards refusing to permit it to be filed as amended.

The vital question before us is whether the covenant relating to demurrage is a dependent or an independent one, and this fact must be determined by the proper construction to be placed on the language employed by the parties to express their agreement. Loud v. Pomona Land & Water Co., 153 U.S. 564, 14 S.Ct. 928, 38 L.Ed. 822; Binz v. Tyler, 79 Ill. 248; Phillips v. Gannon, 246 Ill. 98, 92 N.E. 616; Awotin v. Abrams, 309 Ill.App. 421, 33 N.E.2d 179. Here there seems to be no ambiguous language in the contract with respect to the demurrage, and of course it can not be altered by any prior or contemporaneous oral agreements.

To be sure the intention of the parties governs as to whether the promise to pay demurrage was a material and dependent covenant. Foreman State Trust & Savings Bank v. Tauber, 348 Ill. 280, 180 N.E. 827; Palmer v. Meriden Britannia Co., 188 Ill. 508, 59 N.E. 247. However, in the absence of ambiguity, the intent must be derived from the language of the contract. Loud v. Pomona Land & Water Co., supra; Phillips v. Gannon, supra; Bertlee Co. v. Illinois Publishing & Printing Co., 320 Ill.App. 490, 52 N.E.2d 47.

The breach of an independent provision in a contract which is incidental to its main purpose and which does not go to the whole consideration, does not justify the cancellation of a contract. Kauffman v. Raeder, 8 Cir., 108 F. 171, 54 L.R.A. 247; Krell v. Bovaird Supply Co., 10 Cir., 83 F.2d 414; Watchorn v. Roxana Petroleum Corp., 8 Cir., 5 F.2d 636.

In order to justify an abandonment of a contract, failure of the opposite party must be a total one, resulting in the defeat of the object of the contract, or rendering that object unattainable. Knutson v. Metallic Slab Form Co., 5 Cir., 128 F.2d 408; Selby v. Hutchinson, 9 Ill. 319.

In the light of the decisions referred to, we think the demurrage clause in this contract was an independent covenant and that it did not go to the consideration for the whole contract. Palmer v.

Meriden Britannia Co., supra; Rubens v. Hill, 213 Ill. 523, 72 N.E. 1127; Foreman State Trust and Savings Bank v. Tauber, supra. We are convinced that Arrow's default in the payment of demurrage did not justify Johnston in cancelling the contract.

Judgment affirmed.