**LA SALLE STREET PRESS, INC., Plaintiff-Appellee,**

**v.**

**McCORMICK AND HENDERSON, INC., Defendant-Appellant.**

**No. 18384.**

United States Court of Appeals, Seventh Circuit.

June 11, 1971.

Rehearing Denied July 9, 1971.

Stevens, Circuit Judge, dissented and filed opinion.

Anthony S. Zummer, Chicago, Ill., Leo J. Aubel, Wilfred S. Stone, Chicago, Ill., for defendant-appellant; Stone, Zummer, Livingston & Aubel, Chicago, Ill., of counsel.

Howard W. Clement, Chicago, Ill., Robert P. Cummins, Melvin F. Jager, Hume, Clement, Hume & Lee, Ltd., Chicago, Ill., for plaintiff-appellee.

Before PELL and STEVENS, Circuit Judges, and MORGAN, District Judge.[1]

ROBERT D. MORGAN, District Judge.

This appeal grows out of a suit for patent infringement. Both plaintiff and defendant are engaged in the business of commercial printing in the City of Chicago, Illinois. Plaintiff's complaint alleged that it was the owner of Anderson Patent No. 3,136,248 (hereinafter referred to as the 248 Patent), entitled "Process and Apparatus for Temporarily Indicating Corrections in Text of Printed Matter," and that defendant was infringing the process claims of that patent.

The 248 Patent issued June 9, 1964. Shortly thereafter plaintiff initiated a licensing program which led to the grant of certain licenses outside the Chicago area.

After defendant filed an answer and counterclaim, cross-motions for summary judgment were filed on the issue of infringement. On May 23, 1968, the court entered summary judgment for plaintiff, finding that defendant had infringed the process claims of the 248 Patent if the same were valid. LaSalle Street Press, Inc. v. McCormick and Henderson, Inc., 292 F.Supp. 276 (N.D.Ill.1968). On June 18, 1968, pursuant to stipulation, the court entered an order finding that claim 4 of the patent, the apparatus claim, was not infringed.

After a licensing arrangement was offered to defendant in an offer of settlement, defendant filed a second amended counterclaim, alleging the violation by plaintiff of the antitrust laws in that plaintiff had attempted to monopolize the printing business by price discrimination and unfair competition in violation of the Robinson-Patman Act, 15 U.S.C. 13a, the Federal Trade Commission Act, 15 U.S.C. 45, and the Sherman Act, 15 U.S.C. 2. Upon a motion by plaintiff, the court held that plaintiff's license agreements under the 248 Patent did not involve a sale of a commodity and that there was, thus, no violation of the Robinson-Patman Act. The court held, further, that a cause of action under section 45 could be initiated only by the Federal Trade Commission. Pursuant to that holding, it entered an order dismissing the paragraphs of the second amended counterclaim grounded upon sections 13a and 45. LaSalle Street Press, Inc. v. McCormick and Henderson, Inc., 293 F.Supp. 1004 (N.D.Ill.1968).

On June 3, 1969, the court entered an order striking the paragraphs of the second amended counterclaim, grounded upon the theory that plaintiff had sought to charge an exorbitant license fee under its patent in violation of the Sherman Act. 15 U.S.C. 2. The court held that there was lacking any sufficient specific allegation of injury.

1. The writer of this opinion is sitting by designation from the Southern District of Illinois.

Defendant was denied leave to file a third amended counterclaim. A second amended answer filed by defendant, attempting to aver antitrust violations as a matter of affirmative defense, was stricken upon the ground that such defenses were not timely asserted and were waived.

Following a trial upon the issue of the validity of the 248 Patent, the court found and concluded that all claims of the patent were valid and that the process claims 1 through 3 were infringed by defendant. Judgment was entered ordering an injunction to issue against defendant and ordering defendant to account in damages for the extent of its use and sale of its infringing process. This appeal followed.

Defendant began using its accused process shortly after the 248 Patent was issued in 1964. In 1969, H. B. McCormick, defendant's president, filed a patent application claiming defendant's process as an advancement in the art. He obtained a patent upon that application on October 21, 1969, while this suit was pending.

Specific contentions of error are recited in context herein.

At the outset, we reject defendant's contention that the provisions of Rule 52(a) of the Federal Rules of Civil Procedure do not insulate the trial court's findings of fact because the issue of patentability depends upon documentary evidence.

The general rule that findings of fact may not be set aside unless they are clearly erroneous applies to patent cases as well as others, e. g., Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227, 1229 (7 Cir. 1969), cert. denied, 397 U.S. 1037, 90 S.Ct. 1354, 25 L.Ed.2d 648 (1970); Armour Research Foundation v. C. K. Williams & Co., Inc., 280 F.2d 499, 503 (7 Cir. 1960), cert. denied, 365 U.S. 811, 81 S.Ct. 690, 5 L.Ed.2d 691 (1961), except that in situations in which the factual determination rests *solely* upon documentary evidence this court is as competent as was the trial court to interpret and weigh the evidence. Deep Welding, Inc. v. Sciaky Bros., Inc., *supra*; Charles Peckat Mfg. Co. v. Jacobs, 178 F.2d 794, 802 (7 Cir. 1949), cert. denied, 339 U.S. 915, 70 S.Ct. 575, 94 L.Ed. 1340 (1950).

When faced with findings resting upon a blending of documentary evidence and oral testimony, Rule 52(a) applies, and this court must accept findings of fact unless they are clearly erroneous. Deep Welding, Inc. v. Sciaky Bros., Inc., *supra*, 417 F.2d at 1230; Novo Industrial Corp. v. Standard Screw Co., 374 F.2d 824, 827 (7 Cir. 1967), cert. denied, 389 U.S. 823, 88 S.Ct. 51, 19 L.Ed.2d 75 (1967).

This case is closely parallel to the *Novo Industrial* situation. Expert witnesses testified for both parties with respect to the functional and process claims of the patent in suit and the scope and content of the prior art. In that situation we cannot reject the findings of fact upon the issues of patentability unless we must conclude that they are clearly erroneous.

We also reject at the outset defendant's contention that the trial court applied the wrong standard of patentability in this case. That argument rests upon the court's finding and conclusion that defendant's inconsistent positions with respect to anticipation provided evidentiary support to the findings that the claims of the 248 Patent were not anticipated by the prior art.

Before the court below, the defendant took the position that the teaching of the 248 Patent was obvious in view of the Lowensohn patent, the VanOrden process and the Kellow-Brown process, all hereinafter discussed. In June, 1966, defendant's president had filed an application for a patent upon its accused process, verifying that its process was new and asserting that its process was not anticipated by the prior art, including the 248 Patent. It now urges the VanOrden and Kellow-Brown concepts as identical to plaintiff's claims of invention, yet that art was not brought to the attention of

the Patent Office when defendant processed its application upon the accused process.

This court has recognized the evidentiary value of evidence of such inconsistencies as buttressing the conclusion of the validity of a patent. See McKee Door Co. v. Forest Door Co., Inc., 284 F.2d 809, 814 (7 Cir. 1960). In the *McKee* case, the alleged infringer had sought to obtain a United States patent upon its accused device and had obtained several foreign patents upon substantially the same combination claimed by the plaintiff's patent. In approving the evidentiary value of evidence of that inconsistency, the court noted the "anomalous position of urging the invalidity of that which" the defendant had previously sought for itself in the United States "and on which it now claims foreign protection." See also Zegers v. Zegers, Inc., 365 F.2d 156, 161, n. 11 (7 Cir. 1966), cert. denied, 385 U.S. 948, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 269 (2 Cir. 1967).

That principle is not opposed to the Supreme Court decisions upon which defendant here relies. In Paramount Publix Corp. v. Tri-Ergon Corp., 294 U.S. 464, 476–477, 55 S.Ct. 449, 79 L.Ed. 997 (1935), the court rejected the contention that the alleged infringer was estopped to assert obviousness of the subject matter because defendant had sought to obtain a patent upon an application which would have embraced the claims of the patent in suit. Estoppel was the thrust of the argument. Moreover, it appears that defendant's agent had filed its patent application some seven years prior to the date of issuance of the patent in suit. In the case before us, the inconsistent positions were advanced in two different fora at the same time.

Haughey v. Lee, 151 U.S. 282, 285, 14 S.Ct. 331, 38 L.Ed. 162 (1894), also dealt with the argument that an alleged infringer was estopped by its inconsistent positions from asserting nonpatentability over the prior art. The Court did indicate, however, that the fact that the alleged infringer had taken inconsistent positions at the same time, the one before the Patent Office and the other in court, was evidence which the court might consider as bearing upon the issue of patentability.

█ Plaintiff has not urged estoppel, but only that the court could consider defendant's inconsistent positions for whatever evidentiary bearing that fact might have upon the issue of obviousness. The court's conclusion related to such evidence is likewise so limited and it is consistent with the teaching of the *Haughey* and *McKee Door* cases.

*Patentability of Claim 4*

█ The finding that apparatus claim 4 of the 248 Patent is valid is not clearly erroneous. That claim described a printing projection in conjunction with a slug of printed type adapted to print a temporary identifying symbol in association with a line of type printed by such slug.[2] In response to Patent Office action, an amendment incorporated the limitation that the projection have "a relatively narrow base portion so as to readily permit the removal thereof from said face." As so limited, the claim was allowed over the prior art which described type case with a broad base for final printing of material.

Defendant misconstrues the relevant evidence in its assertion that the Jeffries Banknote slug[3] is identical to the prior

2. "4. A type slug which comprises an elongated main body portion, a line of cast type formed integrally on one of the faces of said body portion, and a printing projection secured to said face and adapted to print a temporary identifying symbol in association with a line printed from said cast type, said printing projection having a relatively narrow base portion so as to readily permit the removal thereof from said face."

3. An infringement suit against Jeffries Banknote Co. was settled upon agreement that Jeffries would pay damages for past infringement and pay for a license under the 248 Patent.

art apparatus used by Phillips & Van-Orden. The Jeffries slug is notched at the base to permit its removal without special tools, corresponding to the narrow base limitation of claim 4. The Van-Orden apparatus employs a conventional broad base, with the character removable only by sawing or other mechanical means. By contrast, the plaintiff's printing projection is sufficiently sturdy to print fifty or more proofs, yet it can be flicked off by use of a quoin key.[4]

As noted above, it is stipulated that defendant's apparatus does not infringe claim 4.

*Validity of the Process Claims*

We find no merit in defendant's assertion that process claims 1 and 3 are *per se* invalid because they claim as invention only the limitation of employment of the narrow-base projection described in claim 4, in conjunction with long established processes in the printing trade.

The apparatus entered into one of the steps by which the process described in the claims is performed. That being the case, mention of the apparatus is essential to description of the process, but those claims cannot be equated with a mere description of an inherent function of operation of a machine as defendant contends, a type of claim which this court has held to be not patentable invention. Miller v. Zaharias, 168 F.2d 1, 2 (7 Cir. 1948), cert. denied, 335 U.S. 823, 69 S.Ct. 47, 93 L.Ed. 377 (1948); Smith Eng. Works v. Nordberg Mfg. Co., 68 F. 2d 492, 494 (7 Cir. 1934). As the latter case points out, a new process may be devised by using a "machine in a manner in which it was never used before," and, although the machine may be essential to the process, "patentability of the process is in no degree dependent upon the characteristic principle of the machine." Smith Eng. Works v. Nordberg Mfg. Co., *supra.*

Claims 1 and 3 define a particular use and object to be achieved by the practice of the process therein described, namely, the temporary identification of lines of type in a proof which have been corrected or otherwise modified subsequent to the printing of a prior proof of the same page of type. Claim 2 is not so circumscribed. It is so broadly drawn that it might apply equally to use in the proofing process and use in the final printing of a customer's order.

That claim reads:

"2. The method of printing a corrected sheet of printed matter, including a plurality of lines of print printed from a plurality of type slugs each forming a line of said printed matter, comprising: removing the type slugs used to print the line in which the correction is to be made, casting and substituting a new type slug for said type slug so removed, *said substituted slug being provided with a readily removable printing projection adapted to print a temporary identifying symbol in association with the line of print* printed from said substituted slug and printing a new sheet of printed matter from said plurality of type slugs." (Emphasis supplied)

With the possible exception of the italicized clause, that claim is descriptive of the long-established printing process as reflected in this record. The italicized language does not precisely limit the claim to the novel use which the patent purports to describe. As the trial court found, and the record clearly supports, the type characters employed in defendant's accused process and in the VanOrden and Kellow-Brown processes, hereinafter described, are readily removable by the use of a saw, a power router or other cutting tool. The claim is broad enough to read on the VanOrden and Kellow-Brown processes which had been used for many years prior to plaintiff's claimed invention. The use of the phrase "a temporary identifying symbol" does not suffice to distinguish the claimed monopoly from the teachings of the prior art. At best, the claim is vague and not

4. A standard printer's tool used to lock galleys of type into page form for printing.

descriptive of the claimed invention. We hold that the trial court's finding that claim 2 is valid is clearly erroneous and that claim 2 must be held to be invalid.

Defendant's principal challenge to validity of the process claims is that the process is an extension of the prior art, which would have been obvious to a mechanic skilled in the art. Emphasis here has shifted from the Lowensohn patent, principally asserted in the court below, to reliance upon process used by one Phillips & VanOrden and by one Kellow-Brown. The Lowensohn patent, among other patents, is a file wrapper reference considered by the Patent Office in granting the 248 Patent. The Phillips and VanOrden and Kellow-Brown processes were apparently not called to the attention of or considered by the Patent Office in connection with the grant of the 248 Patent.

Though defendant has apparently abandoned Lowensohn as an anticipation reference, a summery of its teaching seems to us required. Lowensohn Patent No. 2,002,293 described a method of identifying material added to corrected lines in proofs by using a distinguishing color of ink or by using differing shades of ink of the same color. There can be no question that this reference does not anticipate, as the trial court found.[5]

Phillips & VanOrden, a California-based company, has for years printed telephone directories for telephone companies. That undertaking entailed the printing of monthly, alphabetical directories which were used by the telephone company in its internal operations and the printing of an annual directory which the telephone company distributed to its customers. For a number of years VanOrden has employed a triangular character printed adjacent certain listings of names and phone numbers. The precise purpose of the triangle is not shown in the record, but one witness speculated that the symbol indicated that the number was not yet in service at the time when the monthly directory was printed. It is clear that the triangle was a part of the listing to which it was adjacent and that its purpose was to convey a particular message to company employees using the monthly directories. Once annually, the annual directory for distribution to telephone subscribers was printed in conformity with listings in the then current monthly directory. Before printing the annual directory, however, all the triangular symbols were removed from the type slugs by sawing or other mechanical means.

Kellow-Brown printed periodic price lists ordered by its customers. As each final list was prepared for printing, a dot was cast with certain type slugs to print a corresponding dot symbol adjacent certain lines to indicate the price therein contained had changed since the previous listing. In each instance there was also a footnote notation that the dot denotes a price change. In certain instances, a single dot, with corresponding footnote notation, was used on a page or in conjunction with certain commodities to denote that all prices on that page or that prices of all like commodities had changed since the last previous listing. Such dots were removed before subsequent printings of price lists, with new dots inserted as required to reflect subsequent changes in price. As in the VanOrden use of the triangular symbol, the Kellow-Brown dot was used in final printing to convey information to those using the printed lists.

The trial court found that neither the VanOrden process nor the Kellow-Brown process (both hereinafter referred to as the 15-year-old process) anticipated the patent in suit. It distinguished the so-called 15-year-old process from the teaching of the patent in suit upon the basis that the 248 process claims related to the use of a temporary symbol to denote corrections in proofs, whereas the 15-year

5. In addition to Lowensohn, Middleton Patent 753,604, Clark Patent 801,299, Bruen Patent 872,794, Franceschini Patent 1,034,606, and Speiden Patent 2,065,156 are file references. Such patents described the use of type characters for informational purposes or decoration of a printed page.

old process used standard printing characters to provide additional information to users of the final printed matter of which they were a part. Thus the patent claims were held not anticipated and the court found that the process described a new use of the printing projection having patentable novelty. The court further held that the patented process was not obvious within the meaning of 35 U.S.C. 103, in view of the 15-year-old process and other prior art.

Though we think the question a close one, we are convinced that the trial court's findings that claims 1 and 3 of the patent are valid may not be said to be clearly erroneous.[6]

The linotype machine produces flat, rectangular-type slugs, each including a type face along the top edge thereof for printing a line of characters. The slugs come from the machine in sequential accumulation, arranged side by side in abutting relationship to form a galley of type. A hand compositor then arranges the slugs, sequentially, with the required spacing and depth to conform with the requirements of composition of a page of type. A proof is then "pulled" and submitted to proofreaders employed by the printer.[7] The proofreaders compare the proof with the original copy submitted by the customer from which the type was set. All typographical errors in the proof are noted by pencilled notations and symbols, after which the proof is submitted to the linotype operator for necessary corrections.

Since the slug is the smallest unit of type, every necessary correction requires that the slug in which the error appears be removed from the page of type and that a new slug be cast and set embodying the correction. All slugs in which no correction has been made remain as a part of the page of type. Following insertion of the corrected slugs into the page of type, a second proof is pulled for comparison with the corrected proof. Corrections, if any, are pencilled in, and the corrective process is repeated until a proof is made which conforms, typographically, with the original copy submitted by the customer to be printed.[8]

The typographically correct proof is then submitted to the customer to be read

6. Those claims read:

"1. The method of temporarily identifying a corrected line of print in a succeeding proof sheet of material previously printed comprising: casting a corrected type slug having the printed matter for said line with a readily removable printing projection formed integrally therewith and in addition to said printed matter, substituting said corrected type slug for the original type slug to be corrected and printing said succeeding proof sheet."

"3. The method of preparing multiple proofs of a sheet of printed matter which comprises the steps of casting a plurality of slugs each incorporating a line of type, assembling said slugs to form a page of type, preparing a printed proof of said page from said type, removing at least one of the original type slugs, recasting and substituting a replacement type slug for each said original type slug removed, each said replacement type slug being provided with a readily removable printing projection adapted to print an identifying symbol in association with the line of type printed by said replacement type slug, preparing a second proof of the page from said type including said substitute type slug and subsequently removing said printing projection from said substituted type slug prior to additional printing."

7. A proof is "pulled" by applying ink to the type faces of the slugs in a galley or page of type and impressing thereon a sheet of paper upon which the type characters are imprinted.

A proof may be made from a galley of type, *i. e.*, the accumulated, sequentially related slugs as they come from the linotype machine, the volume being variable, or from a page of type composed as above described. Since the procedure which follows the pulling of the proof is the same in either case, no distinction is herein made between a galley proof and a page proof. We employ the page as a convenient term of reference and the generic noun "proof" in discussing the proofing process, whether it be galley or page proofing.

8. A limited number of typographical errors in the briefs here attest that the process is still subject to human error.

by him for approval, or for any corrections, changes or addenda which he may require. Such changes are noted by pencil on the proof and the proof is returned to the printer for such correction or modification of the type content as the customer may require.

The corrective process is then repeated. Each change requires the replacement of at least one type slug with a corrected slug in the page of type. When material is added to the text, correction entails the resetting and replacement of such number of sequentially adjacent slugs in a paragraph or page as are necessary to retain the requisite page margins.

After corrections required by the customer have been made, a new proof is pulled, compared by the printer's proofreaders with the returned, corrected proof for typographical accuracy, and again submitted to the customer for approval or modification. The process is then repeated until the customer has approved a final proof as acceptable for final printing.

Prior to the development of plaintiff's process, there was nothing on a revised proof to advise the customer which lines had been changed on each successive proof. Comparison of the new proof with the old, without proofreading the whole page, was difficult. It was necessary to search out each line which had been corrected. If correction had required the resetting of a number of lines, it was necessary to determine which lines had been reset and which remained unchanged. The record indicates that that entailed a tedious, expensive process, highly susceptible to the human error of overlooking mistakes in printing.

No workable answer to the problem was found prior to development of the patented process. Plaintiff's president had tried and rejected gradation of color shade some 25 years previously. Gradation was attempted to be achieved by not removing the residual ink from the unchanged slugs in a page of type when the page was inked for subsequent proofing. It was hoped that the residual ink upon unchanged slugs would create a sufficient differentiation in shade in the printed type to make the lighter, changed lines readily distinguishable. That concept did not provide a satisfactory answer. Defendant and others had tried using different color ink to indicate corrected lines, as taught by the Lowensohn patent. That concept, too, was rejected as unsatisfactory.

Plaintiff's patented process did achieve a workable answer to the problem. Using that process, each slug reset in a page of type subsequent to the first proof submitted to the customer contains not only the necessary characters for the line of print, but also a printing projection to marginally print, adjacent that line, a temporary identifying symbol. Slugs in the page which remain unchanged carry no like projection. The customer can readily determine from the temporary mark printed in the margin by the projection which lines have been reset and which remain unchanged. He need compare only the marked lines with the corrections noted on the original proof to determine whether all corrections have been made and whether all reset lines are accurate. If further corrections or addenda are required by the customer, the projections used in printing the proof are removed and projections are recast in conjunction with each subsequently reset slug necessary to incorporate such further changes. A new proof is then pulled for the customer's inspection. Thus, upon each successive proof, the temporary mark identifies each line which has not previously been verified by the customer for accuracy and content. All projections are removed prior to final printing of the material.

In holding these claims valid, the court below considered the scope and content of the prior art and the distinction between the claims and the scope of the prior art. It found that the claimed invention would not have been obvious to one skilled in the art. The court's action conformed to the criteria for resolution of the question of patent validity established by decisions of the Supreme Court. Graham

v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Anderson's Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 61–62, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

The claims must be presumed to be valid, 35 U.S.C. 282, and the party asserting invalidity has the burden of overcoming that presumption. Mumm v. Decker & Sons, 301 U.S. 168, 171, 57 S. Ct. 675, 81 L.Ed. 983 (1937); King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 879 (7 Cir. 1966), cert. denied, 385 U.S. 817, 87 S.Ct. 38, 17 L.Ed.2d 56 (1966); Copease Mfg. Co. v. American Photocopy Equip. Co., 298 F.2d 772, 777 (7 Cir. 1961). The presumption of validity is strengthened where the prior art asserted against validity is no better than that considered and rejected by the Patent Office. TSC Industries, Inc. v. International Harvester Co., 406 F.2d 53, 57 (7 Cir. 1968); National Dairy Products Corp. v. Borden Co., 394 F.2d 887, 891 (7 Cir. 1968), cert. denied, 393 U.S. 953, 89 S.Ct. 378, 21 L.Ed.2d 364 (1968); Ekstrom-Carlson & Co. v. Onsrud Mach. Works, Inc., 298 F.2d 765, 768 (7 Cir. 1962), cert. denied, 369 U.S. 886, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962).

The art considered by the Patent Office, like the VanOrden and Kellow-Brown processes, taught the use of marginal printing characters for informative purposes or decorative purposes in conjunction with a line or page of type. None except Lowensohn related to a process to facilitate recognition of corrected matters in printers' proofs.

As the court below found, the finding of validity is strengthened by the evidence of a long felt but unresolved need, and the commercial success of plaintiff's process, both permissible, relevant, secondary considerations. Graham v. John Deere Co., *supra*, 383 U.S. at 17–18, 86 S.Ct. 684. With reference to the former, the fact that no one prior to the patentee had discovered that patented process, in spite of need, though the individual steps of the process were available in other contexts in the art, is itself evidence of nonobviousness. National Dairy Products Corp. v. Borden Co., *supra*, 394 F.2d at 890.

The record supports the long felt need for some workable means of temporarily marking corrected lines in proofs. And there is nothing of record to indicate that anyone prior to Mr. Anderson perceived a successful process for achieving that end.

The commercial success of the patented process is amply shown by evidence that plaintiff's printing sales had increased almost three-fold in the 5-years' time period intervening between introduction of the process into its business and the trial of the cause. Mr. Anderson's testimony that plaintiff's use of its patented process is the most significant factor in that sales growth stands uncontradicted.

Defendant's reliance upon A R Inc. v. Electro-Voice, Inc., 311 F.2d 508, 512–513 (7 Cir. 1962), is misplaced. In that case this court said that wide acclaim and demonstrated commercial success cannot supply the quality of invention to a patented process which was obviously anticipated by a prior art patent which had not been considered by the Patent Office.

The judgment holding claims 1 and 3 of the 248 Patent valid must be affirmed.

*Infringement*

Defendant's belated challenge of the summary judgment procedure which it initiated is wholly frivolous. The file history of the 248 Patent and the pertinent prior art therein cited was before the court when summary judgment was entered. There being no genuine issue as to any material fact presented to the court, summary judgment was proper. E. g., Singer Mfg. Co. v. Cramer, 192 U.S. 265, 275, 24 S.Ct. 291, 48 L.Ed. 437 (1904); Westward Coach Mfg. Co. v. Ford Motor Co., 388 F.2d 627, 635 (7 Cir. 1968), cert. denied, 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968).

The argument that the existence of the 15-year-old process, not directed to the

court's attention at the time when summary judgment was entered, shows the existence of a genuine issue of material fact is impermissible afterthought. Defendant initiated the summary judgment proceeding, without disclosing any question related to the 15-year-old process, representing to the court that there was no issue of fact remaining upon the issue of infringement. As the court below found after trial of patentability, the 15-year-old process was no more pertinent than was the prior art before the Patent Office. If defendant was of a different opinion when its motion for summary judgment was filed, it was incumbent upon it to disclose the facts fully to the court. See River Plate & Brazil Conferences v. Pressed Steel Car Co., 227 F.2d 60, 63 (2 Cir. 1955).

Relevant to infringement, the record reveals that defendant adopted its accused process shortly after it learned of the 248 Patent. Defendant employs numerals in the margin of a proof to identify recast lines. The initial proof bears no numerals. All corrections in the next subsequent proof have an imprinted "1" in the margin adjacent each corrected line. Corrections made in later proofs are sequentially numbered to indicate the proof-run in which each was made, *i. e.*, "2", "3", etc. All numerical markers are permitted to accumulate until a final proof has been approved for printing. All numerical notations are then removed from the slugs before final printing of the customer's order.

The trial court found that defendant's process infringes the process claims of the 248 Patent both directly and under the doctrine of equivalents. These findings must be sustained.

Defendant's arguments here were exhaustively treated by the trial judge in his reported opinion. LaSalle Street Press, Inc. v. McCormick & Henderson, Inc., 292 F.Supp. 276 (N.D.Ill.1968). Thus, the court found that defendant's process of accumulated numerals was a distinction from the patented process without legal significance. In essence, defendant substitutes a numeral for the printed line which plaintiff's process employs. The same result is accomplished in the same way.

Defendant's arguments that its projection is the standard old slug construction and that it is not readily removable were properly rejected by the trial court. The record reveals that defendant removes such projections by use of an electric router and that its projection can be removed with a chisel and a light tap with a hammer without damage to the slug. It is no answer to infringement that an old apparatus is employed to practice a new process, *e. g.*, Cochrane v. Deener, 94 U.S. 780, 787–788, 24 L.Ed. 139 (1876); Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252, 258 (7 Cir. 1960), cert. dismissed, 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239 (1961), if the old apparatus is adapted to achieve the patented result in an equivalent manner.

The judgment of infringement must be sustained.

*The Antitrust Issue*

Defendant's attempt to aver antitrust violations arose out of efforts to compromise and settle the case.

In November, 1967, plaintiff had informed defendant and the trial court that it would waive its claim for past damages and dismiss the suit if defendant would cease its infringing activities. In June, 1968, at the court's suggestion that the possibility of settlement be explored, plaintiff offered an exclusive license to defendant for a $20,000 annual royalty. Still later, in February, 1969, the $20,000 annual royalty offer was superseded by an offer of a license for a royalty of one per cent of defendant's related printing sales, with a minimum royalty of $5,000 per year.

In its second amended counterclaim, defendant charged that the $20,000 per annum offer was discriminatory because plaintiff had granted licenses to other printers at a lesser royalty.

Factually, the record shows that plaintiff had, in December, 1966, in settlement

of an infringement suit, granted Jeffries Banknote Company, in California, a non-exclusive license to employ the process in its California plant for a paid-up fee of $3,500 and a cross-license. Subsequently that license was renegotiated and Jeffries was granted an exclusive license for use in the State of California for a total royalty of $50,000.

In January, 1967, plaintiff had granted a non-exclusive, paid-up license to Bowne & Co. for $5,000, for use of the process in Bowne's plant in New York.

The only previous offer shown to have been made in the Chicago market area grew out of an infringement charge by plaintiff against R. R. Donnelley & Sons Company. In March, 1967, plaintiff offered Donnelley a non-exclusive license on the process for use in Donnelley's monotype printing operation in Chicago for a royalty of $5,000. That offer was rejected by Donnelley.

The record further indicates that plaintiff, by about early 1968, had changed its licensing policy to the offering of only exclusive licenses in restricted geographic areas in order to lessen the burden of policing its patent.

As was noted at the outset, defendant initially charged violations of the Robinson-Patman Act, 15 U.S.C. 13a, the Federal Trade Commission Act, 15 U.S.C. 45, and the Sherman Act, 15 U.S.C. 2. No contention is here made against dismissal of the Robinson-Patman and FTC Act charges. This appeal is limited to the Sherman Act allegations.

The court below dismissed the Sherman Act allegations of the second amended counterclaim because there was no specific allegation of injury to defendant. Defendant now contends that there is injury because it is burdened with the defense of this suit.

There can be no question that the trial court's decision on this point was proper and must be affirmed. One must ignore the competitive situation to construe plaintiff's offer to defendant as discriminatory. Plaintiff and defendant are direct competitors in the business of printing financial and legal documents in the Chicago metropolitan market area. The Bowne and Jeffries licenses, the only licenses issued, were restricted to New York and California, respectively, areas in which neither plaintiff nor defendant are engaged in business.

Incidental to the monopoly grant of a patent are the rights in the patentee to file suit to protect his monopoly. Virtue v. Creamery Package Co., 227 U.S. 8, 37–38, 33 S.Ct. 202, 57 L.Ed. 393 (1913), to exact royalties "as high as he can negotiate with the leverage" of his monopoly, Brulotte v. Thys Co., 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964), to select the licensees who will be authorized to practice the teaching of the patent, Standard Oil Co. v. United States, 283 U.S. 163, 179, 51 S.Ct. 421, 75 L.Ed. 926 (1931), Extractol Process v. Hiram Walker & Sons, 153 F.2d 264, 268 (7 Cir. 1946), and to consider relevant factors affecting the patentee's own business in determining to whom a license will be offered and the conditions upon which a license will be granted. *E. g.*, Bela Seating Company, Inc. v. Poloron Products, Inc., 438 F.2d 733 (7 Cir. No. 17444, January 25, 1971); Georgia-Pacific Corp. v. United States Plywood-Champion Papers, Inc., 318 F.Supp. 1116, 1140 (S.D.N.Y.1970); Faulkner v. Gibbs, 199 F.2d 635, 639 (9 Cir. 1952); see Activated Sludge, Inc. v. Sanitary District of Chicago, 64 F.Supp. 25, 33 (N.D.Ill.1946), aff'd per curiam, 157 F. 2d 517 (7 Cir. 1946), cert. denied, 302 U.S. 736, 58 S.Ct. 121, 82 L.Ed. 569 (1946).

In the *Bela Seating* case, an alleged infringer asserted the right to a license under a patent in suit for the same royalty charged in a license to a mutual competitor of both parties some five years previously. In sustaining the trial court's rejection of that position, this court said:

"Where * * * there were rational bases upon which Bela could refuse to grant Poloron a license on the same terms as it granted Hampden's license,

there is no invidious discrimination so as to offend the anti-trust law." Bela Seating Company, Inc. v. Poloron Products, Inc., *supra*, 438 F.2d at 738.

Defendant's reliance on Dairy Foods, Inc. v. Dairy Maid Prod. Coop, 297 F.2d 805 (7 Cir. 1961), and Peelers Co. v. Wendt, 260 F.Supp. 193 (W.D.Wash. 1966), is misplaced. In *Dairy Foods* the complaint alleged that defendants had conspired to employ patent pooling and punitive infringement suits as a means to exclude others from the powdered milk industry in violation of the antitrust laws. In *Wendt,* higher lease rates for shrimp processing machines were charged to one group of processors than rates charged to another directly competitive group of processors.

Plaintiff, as the trial court found, filed this suit in good faith to protect its granted monopoly rights on its patent. The offer to defendant was made in an attempt to settle the pending litigation. This is not the *Dairy Foods* situation in which threats of litigation were employed as a tool of an established pattern of punitive and otherwise monopolistic practice. Defendant is not injured by plaintiff's continuing to prosecute its suit after defendant had rejected its settlement offer. Shea v. Blaw-Knox Co., 388 F.2d 761, 765–766 (7 Cir. 1968).

The disallowance of further pleadings was a matter within the discretion of the court. Defendant delayed for more than one year, and until a time when a pre-trial order had entered closing pleadings and discovery and setting the cause for trial, before attempting to assert by answer the antitrust allegations of its stricken counterclaims. The court held the defense waived by inexcusable delay. The record supports the conclusion that the belatedly proffered answer was a dilatory attempt to delay prosecution of the cause, and there is nothing but defendant's bare assertion of the fact to show that the court acted arbitrarily or abused its discretion in the premises. Absent showing of abuse, the court's action may not be overturned by this court. Fisher v. Hartford Accident & Indemnity Company, 329 F.2d 352, 354 (7 Cir. 1964); Arrow Petroleum Co. v. Johnston, 162 F.2d 269, 275 (7 Cir. 1947), cert. denied, 332 U.S. 817, 68 S.Ct. 158, 92 L.Ed. 394 (1947).

Defendant's contention here that the patent is unenforcible because of "fraud" by plaintiff on the Patent Office is not properly before this court. There was no allegation of fraud presented to the court below. The issue cannot be raised for the first time on appeal. Desert Palace, Inc. v. Salisbury, 401 F.2d 320, 324 (7 Cir. 1968).

We have considered all other contentions of error, and variations of contentions of error, advanced by defendant to defeat this judgment. All are rejected except as hereinabove noted.

The judgment is reversed insofar as it holds that claim 2 of the 248 Patent is valid and infringed. The judgment is affirmed in all other respects.

STEVENS, Circuit Judge (dissenting).

As I read the patent, the words "readily removable," as used in claims 1 and 3, describe a temporary printing projection which is more readily removable than a conventional character on a conventional linotype slug. Under this construction of the claims, the accused device does not infringe.

My conclusion that the claims should be given this narrow construction is based on the following considerations:

1. Conventional characters can be removed from the slug by using a power driven router,[1] or by chipping them off

1. The specifications indicate, however, that the inventor contemplated removal by manual application of a simple tool. See Patent No. 3,136,248, column 2, lines 33–35.

one by one with a hammer and chisel.[2] On the other hand, all of the temporary printing projections on one of plaintiff's galleys can be removed by the flick of a quoin key.[3] As a matter of fact, plaintiff's slivers are more "readily removable" than conventional characters.[4]

2. The repeated emphasis throughout the patent on the ready removability of the temporary printing projection persuades me that the inventor did not contemplate the use of conventional characters on conventional slugs in connection with his novel concept.[5]

3. If the words "readily removable" as used in claims 1 and 3 describe a conventional character on a conventional slug, those words could be omitted as surplusage without broadening the claims.

4. If conventional slugs with conventional identifying characters are not excluded from the scope of claim 2 by the words "readily removable," as Judge Morgan has demonstrated, that claim is plainly invalid. However, if we were to make the customary presumption that the Patent Office made a correct analysis of the validity of claim 2, it would follow that the Examiner must have read the words "readily removable" more narrowly. I suggest, therefore, that my reading of those key words is presumptively correct.

Because I construe the claims more narrowly than the majority, I respectfully disagree with the conclusion that the use of conventional characters on conventional slugs infringes claims 1 and 3 of plaintiff's patent.

2. In an affidavit the inventor stated that conventional projections could be removed manually "although the handtool operation would require a slightly longer period of time depending on the number of projections to be removed." (A. 165)

3. Plaintiff flicks off the identifying characters after each revised galley has been proofed. The defendant's system of numbering successive corrections obviates the necessity for removing the identifying characters except on the one occasion prior to preparation for final printing after all corrections have been made.

4. The district court made no finding of fact on this precise point because he decided the infringement issue by granting plaintiff's cross-motion for partial summary judgment. Although plaintiff contends that conventional characters are readily removable within the meaning of the claims, I do not understand plaintiff to dispute the fact that its slivers can be removed more easily than conventional characters.

5. See, *e. g.*:

"More specifically [this invention] relates to a type slug of the same general form as that produced by a conventional typesetting machine, * * * but which is cast with a readily removable printing projection. Such a type slug is utilized in the method disclosed herein as a substitute for a conventional slug originally incorporated in a page of type. The printing projection * * * can be readily eliminated prior to the next printing operation by bodily removal * * * without otherwise disturbing the set type." Column 1, lines 12–24.

"Obviously the projection 16 could take any other suitable form, insofar as the nature of the printed symbol produced thereby is concerned. However, it should have a configuration such that it is readily removable from the face of the slug by the use of a simple tool having an edge capable of cutting off the metal forming the projection 16 from the body of the slug when manually applied thereto." Column 2, lines 28–35.

See also claims 1 and 3 quoted in footnote 6 of Judge Morgan's opinion.